*Execution Version*

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MAY 30, 2015**

**BY AND BETWEEN**

**HALO BRANDED SOLUTIONS, INC.**

**AND**

**NEWTON MANUFACTURING COMPANY**

## TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES................1
    1.1        Purchase and Sale of Assets.................................................................1
    1.2        Purchased Assets..................................................................................1
    1.3        Excluded Assets...................................................................................3
    1.4        Assignment and Assumption of Liabilities.............................................4
    1.5        Excluded Liabilities and Obligations.....................................................5
    1.6        Company's Actions With Respect to Contracts .........................................6
    1.7        Cure Payments ....................................................................................7
    1.8        Deemed Consents and Cures ................................................................7
    1.9        Closing ...............................................................................................8
    1.10      Cash Amount Calculation .....................................................................8
    1.11      Transactions at the Closing.................................................................10
    1.12      Post-Closing Payments ......................................................................10
    1.13      Purchase Price ...................................................................................11

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...................11
    2.1        Organization; Good Standing ..............................................................11
    2.2        Authorization ....................................................................................11
    2.3        Subsidiaries ......................................................................................12
    2.4        Consents and Approvals .....................................................................12
    2.5        No Violation......................................................................................12
    2.6        No Brokers or Finders ........................................................................13
    2.7        Financial Statements and Financial Data................................................13
    2.8        Absence of Changes or Events ............................................................18
    2.9        Assets ...............................................................................................18
    2.10      Proprietary Rights ..............................................................................18
    2.11      Contracts ..........................................................................................19
    2.12      Litigation..........................................................................................21
    2.13      Compliance with Applicable Laws.......................................................21
    2.14      Licenses and Permits..........................................................................21
    2.15      Health, Safety and Environment ..........................................................21
    2.16      [Reserved] ........................................................................................22
    2.17      [Reserved] ........................................................................................22
    2.18      [Reserved] ........................................................................................22
    2.19      Labor Relations.................................................................................22
    2.20      Transactions with Affiliates ................................................................22
    2.21      Real Property ....................................................................................23
    2.22      Warranties ........................................................................................23
    2.23      Product Liability ...............................................................................23
    2.24      [Reserved] ........................................................................................23
    2.25      Customers, Suppliers and Employees...................................................23
    2.26      Disclosure Schedules .........................................................................25

### TABLE OF CONTENTS (CONT'D)

**Page**

ARTICLE III REPRESENTATIONS AND WARRANTIES OF BUYER ...................................25
    3.1        Buyer Organization..................................................................25
    3.2        Authorization .........................................................................25
    3.3        No Violation............................................................................25
    3.4        Consents and Approvals .........................................................26
    3.5        No Brokers or Finders............................................................26

ARTICLE IV CONDITIONS TO CLOSING ...............................................................26
    4.1        Conditions Precedent to Parties' Obligations.........................26
    4.2        Conditions Precedent to Buyer's Obligations.........................26
    4.3        Conditions Precedent to the Company's Obligations...............29
    4.4        Frustration of Conditions ......................................................30

ARTICLE V COVENANTS AND OTHER AGREEMENTS........................................30
    5.1        Access to Information .............................................................30
    5.2        Restrictive Covenants of Company ........................................30
    5.3        Protection of Business Relationships......................................31
    5.4        Name Change.........................................................................31
    5.5        Further Assurances; Account Executive Meeting.....................31
    5.6        Conduct of Business ..............................................................32
    5.7        Transfer Taxes .......................................................................34
    5.8        Bankruptcy Actions ...............................................................34
    5.9        Other Bids .............................................................................35
    5.10      Bankruptcy Matters................................................................35
    5.11      503 Liabilities .......................................................................35
    5.12      Deposit Claims ......................................................................35
    5.13      Notification of Certain Matters ...............................................36
    5.14      Assistance .............................................................................36
    5.15      Employees..............................................................................36
    5.16      Post-Closing Assistance .........................................................37
    5.17      Use of Company Facilities......................................................37
    5.18      Use of Company Systems .......................................................38
    5.19      Consents and Approvals .........................................................38
    5.20      Accounts Receivable Collections ...........................................38
    5.21      Disclosure Schedule Supplements .........................................38

ARTICLE VI TERMINATION...................................................................................39
    6.1        Termination............................................................................39
    6.2        Breakup Fee and Expense Reimbursement..............................41
    6.3        Effect of Termination; Limitation of Liability...........................41

ARTICLE VII MISCELLANEOUS .............................................................................42
    7.1        Non-Survival of Representations and Warranties.....................42
    7.2        Notices ..................................................................................42
    7.3        Entire Agreement; Amendment ..............................................43
    7.4        Counterparts; Deliveries .........................................................43

## TABLE OF CONTENTS (CONT'D)

**Page**

| | | |
|---|---|---|
| 7.5 | No Third Party Beneficiaries | 43 |
| 7.6 | Expenses | 44 |
| 7.7 | No Waiver | 44 |
| 7.8 | Headings | 44 |
| 7.9 | Governing Law | 44 |
| 7.10 | Binding Nature; Assignment | 44 |
| 7.11 | Waiver of Jury Trial | 44 |
| 7.12 | Construction | 45 |
| 7.13 | Public Announcements | 45 |
| 7.14 | Specific Performance | 45 |
| 7.15 | Confidentiality | 45 |

ARTICLE VIII DEFINITIONS ........................................................................45

**EXHIBITS AND SCHEDULES**

Exhibit A                    —     Bid Procedures Order

Exhibit B                    —     DIP Order   (To be provided)

**Disclosure Schedule**      —     **Exceptions to Representations and Warranties**

Schedule 1.2(f)              —     Domain Names

Schedule 1.2(n)              —     Purchased Equipment

Schedule 1.4                 —     Assumed Liabilities

Schedule 1.5(b)              —     Excluded Contracts

Schedule 1.5(o)              —     Cure Amounts

Schedule 1.6(d)              —     Rejected Contracts

Schedule 1.13                —     Illustrative Purchase Price Calculation

Schedule 2.1                 —     Organization; Good Standing

Schedule 2.4                 —     Consents and Approvals

Schedule 2.5                 —     No Violation

Schedule 2.7(a)              —     Financial Statements

Schedule 2.7(b)              —     Inventory

Schedule 2.7(c)              —     Eligible Inventory

Schedule 2.7(d)              —     Accounts Receivable

Schedule 2.7(e)              —     Eligible Accounts

Schedule 2.7(f)              —     Vendor Prepaid Amount

Schedule 2.7(g)              —     Accounts Payable

Schedule 2.7(h)              —     Accrued Commissions

Schedule 2.7(i)              —     Invoicing Irregularities

Schedule 2.8                 —     Absence of Changes

Schedule 2.9                 —     Assets

Schedule 2.10(a)             —     Registered Intellectual Property

Schedule 2.10(b)             —     Licensed Intellectual Property

Schedule 2.10(c)             —     Form Agreement

Schedule 2.12                —     Litigation

Schedule 2.14                —     Licenses and Permits

Schedule 2.15                —     Health, Safety and Environment

Schedule 2.19                —     Labor Relations

Schedule 2.20          —          Affiliate Transactions

Schedule 2.25(a)       —          Customers

Schedule 2.25(b)       —          Suppliers

Schedule 2.25(c)       —          Disputes and Allowances

Schedule 2.25(d)       —          Account Executives

Schedule 2.25(e)       —          Commission Advances Amount

Schedule 5.6           —          Conduct of Business

Schedule 5.12          —          Deposit Claims

Schedule 5.16(a)       —          Transitional Employees

Schedule 5.16(b)       —          Bonus Eligible Employees

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of May 30, 2015, is by and between **HALO BRANDED SOLUTIONS, INC.**, a Delaware corporation ("**Buyer**"), and **NEWTON MANUFACTURING COMPANY**, an Iowa corporation (the "**Company**").    Capitalized terms used but not defined throughout this Agreement are defined in **Article VIII**.

In consideration of the mutual promises and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

1.1    **Purchase and Sale of Assets**.    At the Closing, the Company shall sell, transfer, assign, and deliver to Buyer, and Buyer shall purchase, accept, assume and receive, all right, title and interest in and to the Purchased Assets free and clear of all Liens, whether arising prior to, on or subsequent to the Petition Date.

1.2    **Purchased Assets**.    The "**Purchased Assets**" are substantially all of the assets, properties, rights and claims used in, related to or arising from the Business whether owned or held by the Company or any Affiliate thereof.    Without limiting the generality of the foregoing, the Purchased Assets shall include the following, subject to **Section 5.19** to the extent applicable thereto:

(a)    all accounts receivable, and any payments from Account Obligors of the Business in respect of such accounts receivable, including all Accounts Receivable as defined below;

(b)    all inventory (including raw materials, work in process, samples, supplies and finished goods) located at the Company's facilities, in transit to or from the Company's facilities, or held by the Company, its contractors, or third-party warehouses or vendors or otherwise used in the Business;

(c)    all prepaid and/or advanced commissions paid to any employee, Account Executive or other independent contractor of the Company;

(d)    all rights in, to and under any of the Company's open purchase orders, any unbilled orders and unshipped orders (including, without limitation, advance calendar orders), and all prepaid expenses or advances paid to trade vendors with respect to such open purchase orders;

(e)    all performance and other bonds, security and other deposits, and advances maintained for use in the conduct of the Business;

(f)     all Company Intellectual Property (or rights thereto, including all rights to the use of the name of "Newton Manufacturing Company" and any variations thereof) and all technical, design, processing, manufacturing or marketing information (including new developments), technology, inventions, know-how, processes, ideas and trade secrets and documentation thereof (including related papers, drawings, diaries, notebooks, specifications, designs, methods of manufacture and software), research and data and other similar information and all claims and rights related thereto used in the Business, including, but not limited to, the domain names set forth on **Schedule 1.2(f)** and the Company's program customer websites (the "**Program Customer Websites**");

(g)     all customer files, lists of customers, suppliers and vendors, rights and claims under sales contracts, customer orders, service agreements, purchase orders (whether open or closed), dealer and distributorship agreements and other similar commitments;

(h)     all rights in, to and under all Material Contracts and all other contracts made and entered into in the ordinary course of the Business, including any confidentiality, assignment of intellectual property or other agreements entered into by any of the employees or consultants of the Company, including the NetSuite Software Subscription Services Agreement, dated June 21, 2013 (the "**NetSuite Agreement**") (collectively, the "**Assumed Contracts**");

(i)     all books, records, files, papers and documents relating to the Purchased Assets, the Assumed Liabilities or the operations of the Business, including all accounting books, records, ledgers and electronic data processing software and materials related to the Business (the "**Books and Records**"); provided, that, following the Closing, Buyer shall (i) retain and maintain the Books and Records as they existed on the Closing Date for the period(s) of time required by applicable local, state and federal law, and (ii) during such period(s), provide the Company with access to the Books and Records retained by the Buyer upon the Company's commercially reasonable request(s) and upon reasonable prior written notice during normal business hours;

(j)     all telephone numbers, web sites, domain names, e-mail addresses and other technologies and communication systems, if any (including related computer hardware and software) used in the conduct of the Business;

(k)     all prepaid expenses, including prepaid transaction privilege tax (sales tax) and other prepaids for Cost of Goods Sold (other than with respect to Excluded Liabilities and Obligations) and deferred charges;

(l)     all Permits, if any, and pending applications therefor to conduct the operations of the Business and to own, manufacture, construct, operate and maintain any product, fixture, facility, equipment, vehicle, machinery or installation of the Business;

(m)     all claims, causes of action, choses in action, rights of recovery, defenses or counterclaims and rights of set-off of any kind (including rights under and pursuant to all warranties, representations and guaranties made by suppliers of products, materials or equipment or components thereof) against third parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the

Petition Date) and relating to any Purchased Assets and Assumed Liabilities and the right to make claims under and other benefits of all contracts of insurance with respect to any of the Purchased Assets or Assumed Liabilities, other than the Avoidance Actions set forth in **Section 1.3(a)** and the rights, claims, counterclaims, and demands related to the cause of action described in **Section 1.3(m)**;

(n)     office workstations and other equipment and supplies for approximately twelve (12) employees, as more specifically set forth on **Schedule 1.2(n)** (the "**Purchased Equipment**"); and

(o)     all other assets, properties, rights and claims, including goodwill, related to the operations of the Business or which arise in or from the conduct thereof;

provided, however, that the definition of the Purchased Assets shall not include any items defined as Excluded Assets in **Section 1.3** below.

   1.3     **Excluded Assets**.  Notwithstanding anything to the contrary in this Agreement, the following assets of the Company shall be retained by the Company and are not being sold or assigned to the Buyer hereunder (collectively, the "**Excluded Assets**"):

(a)     all Avoidance Actions (including the proceeds thereof);

(b)     all cash, cash equivalents and marketable securities;

(c)     all capital stock of the Company and of Pella Plastics, Incorporated, an Iowa corporation and wholly owned subsidiary of the Company ("**Pella**");

(d)     Company Benefit Plans;

(e)     all Company Real Property (other than with respect to the rights granted to Buyer pursuant to **Section 5.17** of this Agreement);

(f)     all computer hardware (including desktop and laptop computers and other systems hardware and networking hardware) and all off-the-shelf operating systems and software programs used in connection therewith (in each case, other than computer hardware and software related to the Company's communication systems); and all manuals, forms, guides and other materials used in connection therewith; provided, that (i) the NetSuite Agreement and all software related thereto and (ii) any software required for the operation of the Customer Program Websites are excluded from the foregoing and shall be Purchased Assets.

(g)     other than the Purchased Equipment, all office furnishings, display racks, shelves, decorations, equipment, fixtures and supplies;

(h)     the organizational documents, seals, minute books and other documents of the Company relating exclusively to the organization, maintenance and existence of the Company as a legal entity, including taxpayer and other identification numbers, Tax information and Tax records; provided, however, that copies of such materials shall be Purchased Assets.

(i)    prepaid Taxes and prepaid expenses to the extent pertaining to Excluded Liabilities and Obligations;

(j)    Tax Refunds to the Company and deposits to the extent pertaining to Tax obligations of the Company;

(k)    all rights, liabilities or obligations arising out of or related to the Company Real Property;

(l)    all claims, causes of action, choses in action, rights of recovery, defenses or counterclaims and rights of set-off of any kind (including rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment or components thereof) to the extent pertaining to any Excluded Assets and Excluded Liabilities and Obligations;

(m)    the Company's interest in Newton Manufacturing Co. v. Doyle Clemmons, a/b/a/ Maxxstar, Case # LAC118379, pending on appeal from Jasper Court District Court in Iowa;

(n)    the Company's interest in the following Company-owned life insurance policies with Principal Life Insurance Company: (i) Insured Name: Clayton C. Case, Jr. (Policy No. 3811075, (ii) Insured Name: Mancil Robert Laidig (Policy No. 3925421) and (iii) Insured Name: John D. McNeer (Policy No. 4235269); and

(o)    all rights of the Company under this Agreement.

1.4    **Assignment and Assumption of Liabilities**.

(a)    At the Closing, the Buyer shall assume from the Company and thereafter be responsible for the payment, performance or discharge of only the following Liabilities of the Company (collectively, the "**Assumed Liabilities**"):

(i)    except as may arise from a breach by the Company of **Section 5.11**, administrative expense claims of the Company solely with respect to trade payable obligations for orders shipped and billed after the Petition Date in an amount not to exceed $250,000 in the aggregate to the extent such administrative expense claims arise following the Petition Date and prior to the Closing, and relate solely to the Purchased Assets and are allowed pursuant to Section 503(b)(1) of the Bankruptcy Code (the "**503 Liabilities**");

(ii)    any obligations arising after the Closing in the ordinary course of business under the Assumed Contracts  (other than any obligations related to a breach thereof that occurred prior to Closing);

(iii)    any obligations arising after the Closing in the ordinary course of business under any unbilled orders and unshipped orders (other than any obligations related to a breach thereof or failure to perform thereunder that occurred prior to Closing);

        (iv)      any Cure Amounts with respect to Excluded Contracts that become Assumed Contracts pursuant to **Section 1.6(b)**;

        (v)      any liabilities for amounts owed and payable to the Company's customers relating to or arising out of royalty agreements and rebate programs; and

        (vi)      deferred commissions payable (including accrued bonuses) owing to Account Executives that have been earned prior to the Closing but not paid and any other amounts due to any Account Executive in such Account Executive's capacity as a vendor to the Company.

        (b)      **Section 1.4(a)** shall not limit any claims or defenses Buyer may have against any party. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyer or the Company as compared to the rights and remedies which such third party would have had against the Company absent the Chapter 11 Case and had Buyer not assumed the Assumed Liabilities.

       1.5    **Excluded Liabilities and Obligations**.  The Buyer shall not assume and shall not be liable or responsible for any obligations or liabilities of the Company unless specifically set forth in **Section 1.4**, which excluded liabilities include, but are not limited to, the following obligations or liabilities of the Business, the Company or any Affiliate thereof, or any claim against any of the foregoing, of any kind, whether known or unknown, contingent, absolute or otherwise (the "**Excluded Liabilities and Obligations**"):

        (a)      Indebtedness owing to any Person;

        (b)      all Contracts of the Company other than the Assumed Contracts, including those set forth on **Schedule 1.5(b)** (collectively, the "**Excluded Contracts**");

        (c)      Taxes of any kind accrued in, or allocated to, the period prior to the Closing, including federal, state and local Taxes on income, sales and use, ad valorem duties and assessments, worker's compensation Taxes, and FICA contributions;

        (d)      fees or obligations owing to the Company's Chapter 11 Professionals;

        (e)      all liabilities relating to or arising out of customer prepayments to and deposits with the Company;

        (f)      Taxes of any kind accrued or imposed in connection with the Chapter 11 Case, including Taxes relating to the discharge of debt;

        (g)      all accounts payable not specifically included as Assumed Liabilities;

        (h)      all liabilities and obligations arising out of the employment of any individual by the Company or engagement of any individual as an independent contractor by the Company including (i) liabilities or obligations arising under Company Benefit Plans or any employment contract (including any unfunded pension liabilities and costs associated with termination of the Company's pension plan), (ii) except as provided in **Section 5.16(b)** below,

retention bonuses, Severance Payments or other amounts payable solely as a result of the sale of the Business by the Company to employees under employment contracts or otherwise; and (iii) any claim brought by any employee or former employee arising out of such individual's employment or engagement by the Company; but excluding any earned vacation, sick leave and holiday pay for employees that accept Buyer's offer of employment;

(i)     the Company Closing Costs;

(j)     except for the liabilities set forth on and assumed pursuant to a separate instrument to be delivered by Buyer at Closing, all liabilities and obligations relating to or arising out of the NetSuite Agreement;

(k)     all liabilities and obligations to stockholders, officers and directors of the Company or any Affiliate of the Company, including dividends declared or payable to stockholders of the Company;

(l)     all liabilities relating to any Company Benefit Plan, including without limitation, any ESOP Liabilities, the failure of the Company to comply with any Environmental and Safety Requirements, or the presence of any Hazardous Materials;

(m)     all liabilities pursuant to the WARN Act relating to any action or inaction of the Company prior to the Closing;

(n)     all liabilities under any Assumed Contract which arises out of or relates to any breach that occurred or began prior to the Closing;

(o)     any Cure Amounts with respect to the Assumed Contracts set forth on **Schedule 1.5(o)**;

(p)     any obligation of the Company to indemnify any Person by reason of the fact that such Person was a director, officer, stockholder, employee or agent of the Company or was serving at the request of the Company as a partner, trustee, director, manager, officer, employee or agent of another entity;

(q)     any liabilities or obligations of Pella or otherwise relating to, arising out of, or resulting from the Company's ownership of the capital stock of Pella; and

(r)     all liabilities and obligations for returns, product liability and product warranty for products sold by or on behalf of the Company prior to the Closing.

1.6     **Company's Actions With Respect to Contracts**.

(a)     **Company's Obligation to Maintain Scheduled Contracts until Closing**.  From and after the date of this Agreement, the Company shall not reject or alter (or attempt to alter) the terms of any executory contracts or unexpired leases to which the Company is a party (collectively, the "**Scheduled Contracts**") unless otherwise agreed to in writing by the Buyer or as provided below in **Section 1.6(c)** of this Agreement. The Company shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to

6

Scheduled Contracts and take all other actions necessary to cause such Scheduled Contracts to be assumed by the Company and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code to the extent that such Scheduled Contracts are Assumed Contracts at Closing;

(b)     **Excluding or Adding Assumed Contracts Prior to Closing**.  At the Closing, the Company shall, pursuant to the Sale Order and the Assignment and Assumption Agreement and other transfer and assignment documents reasonably requested by the Buyer, assume and sell and assign to the Buyer (the consideration for which is included in the Purchase Price), all Assumed Contracts which may be assigned by the Company to the Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code and which shall be set forth on the Disclosure Schedules delivered pursuant to the terms of this Agreement. The Buyer shall have the right in its sole and absolute discretion to notify the Company in writing of any Assumed Contract that it does not wish to assume or any Scheduled Contract that it wishes to add as an Assumed Contract up to three (3) Business Days prior to the Closing. At the sole discretion and instruction of Buyer, any such previously considered Assumed Contract that Buyer no longer wishes to assume shall be automatically deemed removed from the Disclosure Schedules related to Assumed Contracts, automatically deemed added to the Disclosure Schedules related to Excluded Contracts, and shall be rejected by the Company  in accordance with **Section 1.6(c)**. At the sole discretion and instruction of Buyer, any such previously considered Excluded Contract that Buyer wishes to assume as an Assumed Contract shall be automatically deemed added to the Disclosure Schedules related to Assumed Contracts, automatically deemed removed from the Disclosure Schedules related to Excluded Contracts, and shall be assumed by the Company and assigned to the Buyer; provided, that any Cure Amounts with respect to such Contract shall be the responsibility of Buyer and shall be treated as an Assumed Liability.

(c)     **Rejection of Excluded Contracts**. As soon as practicable after the Closing Date, the Company shall reject all Excluded Contracts.  To the extent that any executory Contract or unexpired lease relating to the Business is not identified prior to the Closing Date or is not an Assumed Contract or an Excluded Contract on the Closing Date, such executory Contract or unexpired lease shall be deemed an Excluded Contract and the Company shall immediately reject any such executory Contract or unexpired lease upon discovery. The covenants set forth in this **Section 1.6(c)** shall survive the Closing.

(d)     Notwithstanding anything in this Agreement to the contrary, the Company may reject the Contracts set forth on **Schedule 1.6(d)** at any time from and after the Petition Date.

1.7     **Cure Payments**.  The Company shall be responsible for paying all Cure Amounts with respect to the Assumed Contracts set forth on **Schedule 1.5(o)** (which Cure Amounts shall be paid out of the Cash Amount received by the Company) in connection with the assignment and assumption of the Assumed Contracts.  For the avoidance of doubt, the Company shall not be responsible for paying any Cure Amounts with respect to the NetSuite Agreement.

1.8     **Deemed Consents and Cures**.  For all purposes of this Agreement (including all representations and warranties of the Company contained herein), the Company shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Contract if, and to the extent that, pursuant to the Sale Order or other Order of the Bankruptcy Court, the

Company is authorized to assume and assign to Buyer, and Buyer is authorized to accept, such Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, and any applicable Cure Amount has been satisfied by the Company. If the consent required to effectuate the assignment of any Assumed Contracts to Buyer cannot be obtained pursuant to the Sale Order or other Order of the Bankruptcy Court, then the parties shall endeavor to obtain such consent pursuant to **Sections 5.5** and **5.19**.

1.9     **Closing**.  Unless this Agreement is terminated pursuant to **Article VI**, the closing of the transactions that are the subject of this Agreement shall be consummated at a closing (the "**Closing**"), which shall take place (a) by electronic exchange of documents as soon as practicable but no later than three (3) Business Days after the last of the conditions set forth in **Article IV** are satisfied (other than those conditions that by their nature are normally satisfied at the Closing, but subject to the satisfaction of such conditions at the Closing) or waived by the party having the benefit of such condition or (b) such other manner, place or date that is agreed to in writing by the Company and the Buyer (the "**Closing Date**").

1.10     **Cash Amount Calculation**.

(a)     Three Business Days prior to Closing, Buyer shall use the Books and Records and other information provided by the Company to calculate Buyer's good faith estimate of the Cash Amount (the "**Estimated Cash Amount**") and shall deliver a certificate to the Company providing such Estimated Cash Amount and the calculations supportive thereof (the "**Estimated Cash Amount Certificate**"). The Company shall assist Buyer and shall provide information to Buyer as reasonably requested by Buyer in connection with Buyer's preparation of the Estimated Cash Amount Certificate.

(b)     Within ten (10) Business Days after the Closing Date, Buyer will prepare in good faith and deliver to the Sellers a certificate (the "**Cash Amount Certificate**") executed by Buyer setting forth Buyer's determination of the actual Closing Eligible Accounts Value and the Closing Eligible Inventory Value based on the Books and Records and other information available on the date of such certificate and (ii) Buyer's calculation of the Cash Amount based thereon.

(c)     If the Company delivers a written notice (the "**Disputed Items Notice**") to Buyers within five (5) Business Days after receipt by the Company of the Cash Amount Certificate stating that the Company objects to any items in the Cash Amount Certificate (the "**Disputed Items**"), Buyer and the Company will attempt to resolve the Disputed Items as promptly as practicable.  If the Company does not deliver the Disputed Items Notice to Buyer within five (5) days after receipt of the Cash Amount Certificate, the Cash Amount specified in the Cash Amount Certificate will be final and binding on the parties and will be the Cash Amount for all purposes of this Agreement.

(d)     If the Company timely provides a Disputed Items Notice and the Buyer and the Company are unable to agree upon all Disputed Items within fourteen (14) Business Days after delivery of the Disputed Items Notice, Buyer and the Company shall select an independent, nationally recognized accounting firm reasonably acceptable to Buyer and the Sellers (the "**Independent Accounting Firm**") to resolve all Disputed Items not previously

resolved by Buyer and the Company pursuant to **Section 1.10(c)** (the "**Remaining Disputed Items**").  The Independent Accounting Firm shall (i) address only the Remaining Disputed Items and may not assign a value greater than the greatest value claimed for such item by either party or smaller than the smallest value claimed for such item by either party and (ii) re-calculate the Cash Amount, as modified only by the Buyer and the Company's mutual resolution of Disputed Items pursuant to **Section 1.10(a)** and the Independent Accounting Firm's resolution of the Remaining Disputed Items.  Buyer and the Sellers will each have the same opportunity to present their respective positions and to submit materials regarding the Remaining Disputed Items to the Independent Accounting Firm.   The Independent Accounting Firm will make a written determination of each Remaining Disputed Item within thirty (30) days after being selected, based solely on the materials submitted by each party and the applicable definitions included herein and the accounting principles and practices required herein (and not any independent review or determination), and such determination will be final and binding on the parties.  The fees, costs and expenses of the Independent Accounting Firm will be borne by Buyer, on the one hand, and the Company, on the other hand, based upon the percentage that the portion of the contested amount not awarded to each party bears to the amount actually contested by such party.  For example, if the Company claims that the Cash Amount is $1,000 more than the amount provided in the Cash Amount Certificate, and Buyer contest only $500 of the amount claimed by the Company, and if the Independent Accounting Firm ultimately resolves the dispute by awarding the Company $300 of the $500 contested, then the fees and expenses of the Independent Accounting Firm will be allocated 60% (i.e., 300 ÷ 500) to Buyer and 40% (i.e., 200 ÷ 500) to the Company.

(e)     At such time as the Cash Amount is finally determined in accordance with this **Section 1.10** (the "**Final Cash Amount**"):

(i)     if the Final Cash Amount is less than the Estimated Cash Amount and such deficit is less than the Adjustment Holdback, Buyer shall deduct such deficit from the Adjustment Holdback and shall promptly, but no later than five (5) Business Days following the determination of the Final Cash Amount, pay to the Company the remaining Adjustment Holdback, if any, by wire transfer of immediately available funds as directed by the Company;

(ii)     if the Final Cash Amount is less than the Estimated Cash Amount and such deficit is greater than the Adjustment Holdback, (A) Buyer shall retain the Adjustment Holdback (B) the Company shall be liable to Buyer for the amount that such deficit exceeds the Adjustment Holdback (the "**Adjustment Deficit**") and (C) Buyer shall be entitled to set off any additional amounts payable to the Company, including Measurement Period Payment Amounts, to the extent of the Adjustment Deficit;

(iii)     if the Final Cash Amount exceeds the Estimated Cash Amount, Buyer shall promptly, but no later than five (5) Business Days following the final determination of the Final Cash Amount, pay to the Company an aggregate amount equal to the amount of such excess plus the Adjustment Holdback by wire transfer of immediately available funds as directed by the Company; and

(iv)     The "**Cash Amount Adjustment**" is the amount, if any, paid by Buyer to the Company pursuant to this **Section 1.10(e)**.

1.11   **Transactions at the Closing**.  At the Closing, (a) Buyer shall purchase and be assigned the Purchased Assets, (b) in consideration of the Purchased Assets, (i) Buyer shall pay to the Company (x) the Estimated Cash Amount, less the Adjustment Holdback, by wire transfer of immediately available funds as directed by the Company and (y) 100% of the Debt Interests (the aggregate face value of the debt obligations plus any and all accrued and unpaid interest, fees and expenses represented by such Debt Interests, together, the "**Credit Bid Amount**"), and (ii) Buyer shall assume, without duplication, the Assumed Liabilities, and (c) the Company shall pay the Cure Amounts for the Assumed Contracts (which Cure Amounts shall be paid out of the Cash Amount received by the Company).

1.12   **Post-Closing Payments**. From the Closing Date until the one (1) year anniversary thereof (the "**Post-Closing Period**"), as further segmented into monthly periods (each such monthly period commencing with the first full calendar month after the Closing, a "**Measurement Period**"):

(a)   Buyer shall (i) use its reasonable efforts, consistent with its historical business practices, to collect on the Ineligible Accounts and (ii) provide a weekly report to the Company of Buyer's collections, if any, on the Ineligible Accounts.  As soon as practicable after each Measurement Period, Buyer shall calculate the amount equal to 70% of the actual amounts collected on the Ineligible Accounts during such Measurement Period (the "**Ineligible A/R Payment**"). An "**Ineligible Account**" is an Accounts Receivable that was included in the Purchased Assets but did not qualify as an Eligible Account on the Closing Date and is not related to an order that had been invoiced but not shipped prior to the Closing Date or an order that was not invoiced and sent to the Account Obligor prior to Closing.

(b)   Buyer shall use its reasonable efforts, consistent with its historical business practices and current business needs, to use in the ordinary course of its business inventory items that are Purchased Assets and do not qualify as Eligible Inventory on the Closing Date (the "**Ineligible Inventory**").  As soon as practicable after each Measurement Period, Buyer shall calculate the amount equal to 90% of the book value of the Ineligible Inventory used by Buyer during such Measurement Period (the "**Ineligible Inventory Payment**").

(c)   Buyer shall (i) use its reasonable efforts, consistent with its historical business practices, to track open orders that are Purchased Assets and associated with the Closing Commission Advances Amount, and (ii) provide a weekly report to the Company of the open orders that relate to the Closing Commission Advances Amount.  As soon as practicable after each Measurement Period, Buyer shall calculate the amount of the Closing Commission Advances Amount that relate to open orders that Buyer actually shipped, billed and collected on during such Measurement Period (the "**Commission Advances Payment**").

(d)   Buyer shall use its reasonable efforts, consistent with its historical business practices, to track open orders that are Purchased Assets and associated with the Closing Vendor Prepaid Amount.  As soon as practicable after each Measurement Period, Buyer shall calculate the amount of the Closing Vendor Prepaid Amount that relate to open orders that Buyer actually billed and collected on during such Measurement Period (the "**Vendor Prepaid Payment**").

10

(e)    Within thirty (30) days following the end of each Measurement Period, Buyer shall pay to the Company an amount equal to the Ineligible A/R Payment, the Ineligible Inventory Payment, the Commission Advances Payment, and Vendor Prepaid Payment calculated for such Measurement Period (collectively, the "**Measurement Period Payment Amount**") by wire transfer of immediately available funds as directed by the Company.

(f)    The Measurement Period Payment Amounts shall be determined in good faith by Buyer and shall be final and binding upon the parties. Upon receipt by the Company of the final Measurement Period Payment Amount at the end of the Post-Closing Period, (i) any remaining Ineligible Accounts shall be considered uncollectable and Buyer shall have no further obligation with respect to collecting, accounting for, or payment on such Ineligible Accounts to the Company and may treat such Ineligible Accounts as Buyer determines in its sole discretion, and (ii) Buyer shall have no obligation or liability to the Company with respect to any remaining amounts related to the Ineligible Inventory, the Closing Vendor Prepaid Amount and the Closing Commission Advances Amount.

1.13    **Purchase Price**. The aggregate purchase price for the Purchased Assets (the "**Purchase Price**") is equal to the sum of (a) the amounts paid by Buyer pursuant to **Section 1.11** plus (b) Buyer's assumption of the Assumed Liabilities plus (c) if applicable, the Cash Amount Adjustment plus (d) if applicable, the Measurement Period Payment Amounts. Upon receipt by the Company of the Credit Bid Amount, all obligations of the Company under the DIP Credit Facility and the Prepetition Loan Facility shall be deemed satisfied in full and cancelled pursuant to the Sale Order.  For illustrative purposes only, a sample calculation of the Purchase Price is set forth on **Schedule 1.13**.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Buyer that each statement contained in this **Article II** (except where otherwise noted) is true and correct as of the date of this Agreement and the Closing Date:

2.1    **Organization; Good Standing**.  The Company is a corporation incorporated in the State of Iowa, and is duly organized, validly existing and in good standing under the laws of the State of Iowa and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.  The Company is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on **Schedule 2.1**, which are all of the jurisdictions in which the nature of the Business or the location of the Purchased Assets requires the Company to so qualify if failure to so qualify would be material to the Company.  The Company collects Tax in the states listed on **Schedule 2.1**, which are all of the jurisdictions in which the nature of the Business or the location of the Purchased Assets requires the Company to collect Tax.

2.2    **Authorization**.  Subject to any necessary authorization from the Bankruptcy Court and prior to the Petition Date, the ESOP and ESOP Trustee, the Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and

each agreement, document, certificate or instrument executed in connection with this Agreement (collectively the "**Transaction Documents**") to which it is a party.  The execution and delivery of this Agreement and the Transaction Documents to which the Company is party, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the transactions contemplated hereby and thereby have been duly authorized by the Board of Directors of the Company, and no other proceeding on the part of the Company is necessary. This Agreement and, as of the Closing Date, the Transaction Documents to which the Company is party have been duly executed and delivered by the Company and, subject to any necessary authorization form the Bankruptcy Court, constitute the legal, valid and binding obligation of the Company, enforceable against it in accordance with their respective terms.

2.3     **Subsidiaries**.  The Company's sole Subsidiary is Pella, which, as of the date hereof, is an inactive entity and has been administratively dissolved by the Iowa Secretary of State, has no assets or operations, and since January 1, 2012, has not conducted any business operations on behalf of itself or the Company and does not own, license or lease any assets or rights used in the Business.  Other than Pella, there are no other subsidiaries, corporations, partnerships, joint ventures, associations or other entities related to the Business in which the Company owns, of record or beneficially, any direct or indirect equity interests or other interest or any right (contingent or otherwise) to acquire the same.  The Company is not a participant in any joint venture or similar arrangement related to the Business.

2.4     **Consents and Approvals**.  Except as set forth on **Schedule 2.4** and any approvals required by the Bankruptcy Court and, prior to the Petition Date, the ESOP and ESOP Trustee, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any multi-national, foreign, national, state, provincial, local, governmental, judicial, public, quasi-public, administrative or self-regulatory authority, agency, commission or organization (collectively, "**Governmental Authority**") or other Person is required to be made or obtained by the Company in connection with the authorization, execution, delivery and performance of this Agreement and the Transaction Documents, or the consummation of the transactions contemplated hereby and thereby.

2.5     **No Violation**.  Except as set forth on **Schedule 2.5** and any approvals required by the Bankruptcy Court, the execution, delivery and performance by the Company of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not:

(a)     result in the material breach of any of the terms or conditions of, or constitute a material default under, or in any manner release any party thereto from any material obligation under, or otherwise materially affect any rights of the Company under, any mortgage, note, bond, indenture, contract, agreement, license or other instrument or obligation of any kind or nature, in any case whether written or oral, by which any of them may be bound or affected;

(b)     violate or conflict with any material law, order, permit, writ, injunction, judgment, rule, regulation, statute, ordinance, treaty, constitution, directive, code, order, decree or other decision of any court, administrative agency, or Governmental Authority (collectively, "**Laws**");

(c)    violate any provision of the Organizational Documents of the Company; or

(d)    result in the creation or imposition of any Lien upon any of the Purchased Assets.

2.6    **No Brokers or Finders**.  Other than the agents, representatives and professionals of the Company that may be appointed by the Bankruptcy Court in the Chapter 11 Case (collectively, the "**Chapter 11 Professionals**"), the Company has not retained any broker or finder, or made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement which is or may be payable by the Buyer.

2.7    **Financial Statements and Financial Data**.

(a)    **Schedule 2.7(a)** contains the audited balance sheets and statements of income, cash flow and changes in owners' equity of the Company as of, and for the annual periods ended March 31, 2013 and March 31, 2014 (the "**Financial Statements**").  Each of the Financial Statements is true, complete and correct in all material respects, is consistent with the Books and Records (which, in turn, accurately and fairly reflect in all material respects all the transactions of, acquisitions and dispositions of assets by, and incurrence of liabilities by, the Company), do not include or omit to state any material fact which renders them misleading, and fairly and accurately presents the Company's financial condition, assets and liabilities as of the respective dates and the results of operations and changes in financial position as of the dates thereof and for the periods covered thereby, and has been prepared in accordance with GAAP consistently applied throughout the periods covered thereby.  None of the Financial Statements contains any items of a special or nonrecurring nature, except as expressly stated therein, and such Financial Statements do not reflect any write-up or revaluation increasing the book value of any asset of the Company.  Except as otherwise stated in the Financial Statements, the Company's internal controls and procedures are adequate and appropriate to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the audited Financial Statements for external purposes.  All historic audited financial data provided or made available to Buyer and its agents and representatives in connection with their due diligence investigation of the Company has been true, correct and complete.

(b)    **Schedule 2.7(b)** contains a true, correct and complete list of all inventory (including stock inventory and drop-ship inventory) of the Company related to the operation of the Business as of the date hereof, including (i) the original purchase price thereof (and in the case of drop ship inventory, the Company's purchase price therefor), the value at which each such item is currently carried on the Company's books and (ii) whether such inventory is stock inventory or drop-ship inventory.  The inventory is and will be, as the case may be, of good, useable and merchantable quality in all material respects and is saleable in the ordinary course of business except to the extent written down or reserved against in the balance sheet of the Company as of the Latest Balance Sheet Date.

(c)    **Schedule 2.7(c)** contains a true, correct and complete list, as of the close of business on the business day immediately prior to the date of, of all of the Company's Eligible

Inventory.  "**Eligible Inventory**" is inventory of the Company that is, as determined by Buyer in good faith:

(i)        (A) lawfully owned by the Company, (B) subject to a perfected first priority lien in favor of either the Prepetition Loan Lenders or the DIP Lenders and (C) not subject to any other assignment, claim or Lien, other than statutory Liens or encumbrances that do not have priority over the Lien in favor of either the Prepetition Loan Lenders or the DIP Lenders;

(ii)        subject to a valid and enforceable agreement with the customer for whom the Company holds the inventory and such agreement obligates such customer to repurchase such inventory upon termination of such agreement or for lack of marketability of such inventory;

(iii)        connected to a customer program that is a Purchased Asset;

(iv)        not held on consignment by the Company or an Affiliate of the Company as a consignor and is not being processed offsite at a third party location or outside processor;

(v)        finished goods or blank goods held for sale in the ordinary course of the Company business and is of good and merchantable quality;

(vi)        not covered by a negotiable document (such as a bill of lading or warehouse receipt) (other than "in-transit" inventory which is eligible under clause (ix) below);

(vii)        in the possession and control of the Company and it is stored and held in facilities on Company Real Property;

(viii)        not inventory produced in violation of the Fair Labor Standards Act and subject to the "hot goods" provisions contained in Title 29 U.S.C. §215;

(ix)        not subject to any material written agreement which would materially restrict Buyer's ability to sell or otherwise dispose of such inventory;

(x)        not "in transit" to the Company.

(xi)        not the subject of a consignment by the Company as consignor, and is not being processed offsite at a third party location or outside processor;

(xii)        not unacceptable due to age, type, category, quality, quantity and/or any other reason whatsoever; and

(xiii)        not obsolete or slow moving, and is of good and merchantable quality free from any defects which might adversely affect the market value thereof.

(d)        **Schedule 2.7(d)** contains a true, correct and complete list of all of the Company's accounts and notes receivable outstanding as of close of business on the business day

immediately prior to the date hereof (collectively, the "**Accounts Receivable**"), separately identifying each invoice with respect thereto and, with respect to each such invoice, the obligor the, the date of the invoice and the invoice number.  The Accounts Receivable of the Company (i) arose from bona fide transactions in the ordinary course of business and are payable on ordinary trade terms, (ii) are legal, valid and binding obligations of the respective debtors enforceable in accordance with their terms, (iii) are not subject to any set-off, counterclaim, complaint or other defense, (iv) are collectible in the ordinary course of business of the Company, consistent with past practice, in the aggregate recorded amounts thereof, (v) are not the subject of any Proceedings brought by or on behalf of the Company and (vi) do not represent obligations which are conditional on an occurrence or event, or the absence of an occurrence or event.  **Schedule 2.7(d)** sets forth a description of historical write-off experiences of the Company with respect to its accounts receivable during each of the years ended March 31, 2013 and 2014.

(e)    **Schedule 2.7(e)** contains a true, correct and complete list, as of (i) April 30, 2015 for those accounts associated with the Company's "Neon" software system, and (ii) May 14, 2015 for those accounts associated with the Company's "NetSuite" software system, of all of the Company's Eligible Accounts.  "**Eligible Accounts**" are all Accounts Receivable as determined by Buyer in its good faith discretion; provided, that Eligible Accounts shall not include any of the following Accounts Receivable:

(i)    Any Accounts Receivable that remains unpaid more than 90 days after its original invoice date;

(ii)    all Accounts Receivable owed by a single Account Obligor, if 50% or more of the balance owed by such Account Obligor on such Accounts Receivable is ineligible pursuant to clause (i);

(iii)    all Accounts Receivable for which the Account Obligor is an officer, director, shareholder or partner of the Company or an Affiliate of the Company;

(iv)    any Accounts Receivable for which payment by the Account Obligor is or may be conditional;

(v)    any Accounts Receivable subject to "bill and hold" practices or any other repurchase or return rights;

(vi)    any Accounts Receivable for which the Account Obligor maintains its chief executive office outside of the continental United States of America unless such Accounts Receivable are backed in full by an irrevocable letter of credit in form and substance satisfactory to Buyer;

(vii)    any Accounts Receivable for which the Company is or may become liable to the Account Obligor for goods sold or services rendered by such Account Obligor to the Company (an "**offsetting liability**"), but only to the extent of the Company's then-aggregate offsetting liabilities to such Account Obligor (the excess of the aggregate face amount of Accounts Receivable of such Account Obligor over the aggregate offsetting liabilities

of the Company to such Account Obligor shall constitute an Eligible Account unless otherwise excepted under this definition of Eligible Accounts);

(viii)   any Accounts Receivable for which the goods giving rise thereto have not been shipped and delivered to the Account Obligor thereof or with respect to which the services performed giving rise thereto have not been completed;

(ix)   any amounts due with respect to any order that has not been invoiced and sent to the Account Obligor thereof prior to the Closing Date;

(x)   any Accounts Receivable which are not invoiced (and dated as of such date) and sent to the Account Obligor thereof concurrently with or not later than thirty (30) days after the shipment and delivery to said Account Obligor of the goods giving rise thereto or the performance of the services giving rise thereto;

(xi)   any Accounts Receivable for which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by the Company (or by any agent or custodian of the Company) for the account of or subject to further and/or future direction from the Account Obligor thereof;

(xii)   any Accounts Receivable arising (A) from a consignment sale, a "guaranteed sale", a "sale on approval" or a "sale or return", (B) from a re-billed or refreshed invoice, or (C) outside of the ordinary course of business;

(xiii)   any Accounts Receivable as to which Buyer reasonably determines in good faith and after consultation with the Company, that the prospects of payment or performance by the Account Obligor is or will be impaired in any material respect;

(xiv)   the full portion of any Accounts Receivable that is subject to any dispute, offset, counterclaim, discount (except for ordinary course prompt payment discounts) or other claim or defense on the part of the Account Obligor for such portions or to any claim on the part of the Account Obligor contesting or denying liability under such portions of such Account;

(xv)   any Accounts Receivable which are not subject to a first priority perfected security interest in favor of the Prepetition Loan Lenders or the DIP Lenders;

(xvi)   any Accounts Receivable which are not lawfully owned by the Company free and clear of any Lien (other than the Lien granted by the Company in favor of the Prepetition Loan Lenders or the DIP Lenders and statutory Liens that do not have priority over Liens in favor of the Prepetition Loan Lenders or the DIP Lenders) or which are not in full conformity with all representations and warranties made by the Company in the Prepetition Credit Agreement, as amended;

(xvii)   any Accounts Receivable for which the Account Obligor (A) has filed a petition for bankruptcy or any other relief under the Bankruptcy Code or any other law relating to bankruptcy, insolvency, reorganization or relief of debtors, made an assignment for the benefit of creditors, had filed against it any petition or other application for relief under the

16

Bankruptcy Code or any such other law, (B) has failed, suspended business operations, or called a meeting of its creditors for the purpose of obtaining any financial concession or accommodation, (C) has had or suffered to be appointed a receiver or a trustee for all or a significant portion of its assets or affairs or (D) in the case of an Account Obligor who is an individual, has died or been declared incompetent; and

(xviii) any Accounts Receivable for which the Account Obligor is located in any jurisdiction that has adopted a statute or other requirement with respect to which any Person that obtains business from within such jurisdiction must file a notice of business activities report or make any other required filings in a timely manner in order to enforce its claims in such jurisdiction's courts unless (A) such notice of business activities report has been duly and timely filed or the Company is exempt from filing such report and has provided Buyer with reasonably satisfactory evidence of such exemption or (B) the failure to make such filings may be cured retroactively by the Company for a nominal fee.

(f)      **Schedule 2.7(f)** contains a true, correct and complete list, as of the close of business on the business day immediately prior to the date hereof, of all of the Company's prepaid expenses or advances paid to vendors with respect to open purchase orders that are not subject to any set-off, counterclaim, complaint or other defense (the "**Vendor Prepaid Amount**").

(g)      **Schedule 2.7(g)** contains a true, correct and complete list of all of Company's accounts payable outstanding as of the close of business on the business day immediately prior to the date hereof, separately identifying each invoice with respect thereto, and with respect to each such invoice, the payee, the date of the invoice and the invoice number.  The accounts payable and accruals of the Company have arisen in bona fide arm's-length transactions in the ordinary course of business. **Schedule 2.7(g)** further sets forth a list of suppliers and trade vendors that, as of the close of business on the business day immediately prior to the date hereof, have notified (or delivered a complaint to) the Company (in writing) and/or filed a claim relating to any account payable that was past due pursuant to its payment terms.  As of the date hereof, there are no unpaid invoices or bills representing amounts alleged to be owed by the Company, or other alleged obligations of the Company, which the Company has disputed or determined to dispute or refuse to pay.

(h)      **Schedule 2.7(h)** contains a true, correct and complete list of all of Company's accrued commissions, as of the close of business on the business day immediately prior to the date hereof, owed to its employees and independent contractors and the amount of commissions that the Company has advanced to its employees and independent contractors on an individual basis.   The Company has properly reserved for all uncollectible advances of commissions, in accordance and consistent with past practice, and such reserve is reflected on the Financial Statements.

(i)      Except as set forth on **Schedule 2.7(i)**, the Company has not taken any action to accelerate the invoicing of customers, including, but not limited to, making any attempt to invoice orders out of the ordinary course of business, having staff devote more resources than has been the ordinary course of business, encouraging vendors to submit invoices to the Company more quickly than has been the ordinary course of business or otherwise.

2.8    **Absence of Changes or Events**.  Except as set forth on **Schedule 2.8**, since March 31, 2014, the Company has conducted the Business in the ordinary course of business. Without limiting the generality of the foregoing, since March 31, 2014, except as disclosed on **Schedule 2.8**, there has not been:

(a)    any acquisition or disposition by the Company of any business or line of business or the disposition of a significant amount of assets, whether by merger, purchase or sale of stock, purchase or sale of assets or otherwise (or commitment therefor); or

(b)    any damage, destruction or other casualty loss (whether or not covered by insurance) materially affecting the Business, the Purchased Assets or the Company.

2.9    **Assets**.

(a)    Except as set forth on **Schedule 2.9**, the Company has good and marketable title to or a valid leasehold or license interest all of the Purchased Assets, free and clear of any and all Liens.

(b)    Subject to Bankruptcy Court approval, the Company has the power and the right to sell, assign and transfer and the Company will sell and deliver to Buyer, and upon consummation of the transactions contemplated by this Agreement, Buyer will acquire good and marketable, and indefeasible title to the Purchased Assets, free and clear of all Liens.

(c)    The Transaction Documents, when duly executed and delivered by the Company to Buyer at the Closing, will effectively vest in Buyer good and marketable, and indefeasible title to the Purchased Assets, subject only to the Assumed Liabilities.

2.10    **Proprietary Rights**.

(a)    **Schedule 2.10(a)** contains a complete list (specifying the owner thereof and the patent, registration or application number and issuance, registration or filing date if applicable) of all patented or registered Intellectual Property owned by the Company and all applications therefor, all material unregistered Trademarks owned by the Company, and all proprietary Software.  Except as otherwise set forth on **Schedule 2.10(a)**, no Person other than the Company has any right, title or interest in or to, including any right to use, any of such Intellectual Property owned by the Company.

(b)    **Schedule 2.10(b)** contains a complete list (including the owner thereof, the patent, registration or application number if applicable, the termination or expiration dates thereof and any license or other agreement relating thereto), of all Intellectual Property licensed to the Company (excluding generally commercially available, off the shelf software programs licensed pursuant to shrink-wrap or "click to accept" agreements with a replacement cost and/or annual license fee of less than $2,000), and all internet IP addresses registered to or used by the Company.

(c)    The Company owns the entire right, title and interest in and to, free and clear of Liens, or has the right to use pursuant to a valid and enforceable license set forth on **Schedule 2.10(b)**, all Intellectual Property necessary for or used in the operation of the Business

as currently conducted (together with all Intellectual Property owned by the Company or otherwise set forth on **Schedules 2.10(a)** or (**b**), collectively, the "**Company Intellectual Property**").  To the Company's Knowledge, none of the Company Intellectual Property is invalid or unenforceable in whole or in part.  No loss or expiration of any of the Company Intellectual Property is pending, or, to the Company's Knowledge, threatened.   To the Company's Knowledge, the Company has taken all action necessary, performed all customary acts, and paid all fees and taxes (to the extent applicable), required to protect and maintain in full force and effect the Company Intellectual Property.  Attached as **Schedule 2.10(c)** is a copy of the form of agreement customarily signed by Company employees when accepting employment with the Company.

(d)     (i) There are no claims that were either pending during the previous three (3) years or are presently pending contesting the validity, use, ownership or enforceability of any of the Company Intellectual Property, and, to the Company's Knowledge, no such action is threatened, (ii) the operation of the Business as currently conducted, is not infringing, misappropriating or otherwise conflicting with the Intellectual Property of any other Person, and has not done so, and no notices have been received by the Company regarding any of the foregoing (including any cease-and-desist letters or demands or offers to license any Intellectual Property from any other Person), and (iii) to the Company's Knowledge, no other Person is infringing, misappropriating or otherwise conflicting with the Company Intellectual Property.

2.11     **Contracts**.  **Schedule 2.11** sets forth a true, correct and complete list of each of the following Contracts, agreements, licenses, commitments, obligations and understandings, in any case whether written or oral (together with the open orders set forth in the Open Order Reports), to which the Company is party or by which any Purchased Asset is bound, that:

(a)     provides for future potential receipt of, or payment by, the Company of more than $10,000;

(b)     prohibits the Company from freely engaging in any business or competing anywhere in the world, including any nondisclosure or confidentiality agreement, settlement, co-existence or similar contract that restricts the geographic or operational scope of the Company's business or the ability of the Company to enter into any new line of business, any right of first offer or first refusal with respect to the sale, license or other disposition of any asset, any division or any business of the Company, or any contract prohibiting the Company from granting any rights or conducting any business or that otherwise restricts the Company's activities or the use of any Intellectual Property;

(c)     relates to Indebtedness, including a Guarantee;

(d)     is a license (whether as a licensor or licensee) or similar agreement permitting the use of any Intellectual Property (other than off-the-shelf software);

(e)     involves the sharing of profits, losses, costs or liabilities by the Company with any other Person in a joint venture, partnership or similar agreement;

(f)     involves hedging or similar transactions;

19

(g)       grants a power of attorney on behalf of the Company;

(h)       involves any investment or capital contribution in any Person or advance or loan to any Person by the Company or requires or obligates the Company to make any investment in, or advance, loan or capital contribution to, any Person (other than the advance or reimbursement of reasonable business expenses incurred or to be incurred in the ordinary course of business);

(i)       is an agreement pursuant to which the Company leases, subleases, occupies or otherwise uses any real property (the "**Real Property Leases**");

(j)       is an agreement pursuant to which (i) the Company leases, holds or otherwise uses any machinery, equipment, vehicle or other tangible personal property owned by any third Person or (ii) the Company is the lessor of, or makes available for use by any third Person, any tangible personal property owned by it for an annual rent;

(k)       provides for the supply of goods or services to a Governmental Authority;

(l)       is a sales representative, distributor, dealer, advertising, consultant, independent contractor, lobbying, manufacturer's representative, franchise, agency or similar agreement;

(m)       relates to the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis, including, but not limited to, agreements (i) providing for the payment of any cash or other compensation or benefits upon the consummation of the transactions contemplated hereby; (ii) providing any severance benefits or making any severance arrangements; or (iii) restricting its ability to terminate the employment of any employee at any time for any lawful reason or for no reason without penalty or liability;

(n)       is a collective bargaining agreement or Contract with any union;

(o)       relates to the acquisition or disposition of any business (whether by merger, sale of equity interests, sale of assets or otherwise);

(p)       relates to the creation, improvement or development of any Intellectual Property; or

(q)       is not of the foregoing type and is material to the conduct of the Business

(collectively, and together with the Insurance Policies and Company Benefit Plans, the "**Material Contracts**").  The Company has provided Buyer with true and correct copies of all Material Contracts, including all amendments, waivers and other modifications thereof.  Except for defaults that will be cured through payment of the Cure Amounts or arising solely as a consequence of the commencement of the Chapter 11 Case, the Company is not in default in any material respect, nor has any event occurred which with the giving of notice or passage of time or both would constitute a material default, under any Material Contract or any other obligation owed by the Company thereunder.  To the Company's Knowledge, no other party to any Material Contract is in default thereunder nor, to the Company's Knowledge, has any event occurred

which with the giving of notice or the passage of time or both would constitute a default by any other party to any such Material Contract. Each Material Contract is in full force and effect, is valid and enforceable against the other party thereto in accordance with its terms and, to the Company's Knowledge, is not subject to any claims, charges, set offs or defenses.

2.12    **Litigation**.  Except as set forth in **Schedule 2.12**, since January 1, 2013 there has been no, and there is currently no, suit, action, proceeding, investigation, grievance, claim or order (collectively, "**Proceedings**") pending or, to the Company's Knowledge, threatened against the Company, any Stockholder or any of the current or former officers, directors or employees of the Company with respect to the Business, the Assumed Liabilities, or the Purchased Assets, before any court, or before any Governmental Authority.  None of the Company or any Affiliate thereof (a) is subject to any judgment, order or decree of any court or Governmental Authority; (b) has received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed from a legal standpoint, to any liability that may be material to the Business; or (c) is engaged in any legal action to recover monies due it or for damages sustained by it or to cause a third party to act or refrain from acting in a certain manner.

2.13    **Compliance with Applicable Laws**.  The Company is and has been since January 1, 2013 in material compliance with all Laws and requirements in connection with the conduct, ownership, use, occupancy or operation of the Business and the Purchased Assets, and the Company has not received notice (written or oral) at any time since January 1, 2013 of any violation of any Law or requirement in connection with the conduct, ownership, use, occupancy or operation of the Business or the Assets.

2.14    **Licenses and Permits**.  The Company holds, and at all times since January 1, 2013 has held, and, as of the Closing will hold, all Permits, if any, necessary for the conduct, ownership, use, occupancy or operation of the Business or the Purchased Assets, all of which are identified on **Schedule 2.14**.  The Company is, and at all times since January 1, 2013 has been, in material compliance with such Permits, all of which are in full force and effect, and neither the Company nor any Stockholder has received any notices (written or oral) to the contrary.

2.15    **Health, Safety and Environment**.  Except as set forth on **Schedule 2.15**,

(a)    Since January 1, 2013 the Company has complied with, and is currently in material compliance with, all applicable Environmental and Safety Requirements.

(b)    Since January 1, 2013 the Company has not been subject to, or received any written notice of, any private, administrative, or judicial action, or written notice of any intended private, administrative, or judicial action related to the presence or alleged presence of Hazardous Materials in, under, or upon any real property currently or formerly owned, leased, or used by (i) the Company or any of its predecessors, or (ii) any Person that has, at any time, transported, treated, or disposed of Hazardous Material on behalf of the Company or any of its predecessors; and there are no pending or, to the Company's Knowledge, threatened actions or proceedings (or notices of potential actions or proceedings) from any Governmental Authority or any other Person regarding any matter relating to Environmental and Safety Requirements.

(c)    To the Company's Knowledge, there (i) are no present events, conditions, circumstances, activities, practices, incidents, or actions, and (ii) with respect to any period of time during which the Company owned or occupied any real property used in the conduct of the Company's business, have been no past events, conditions, circumstances, activities, practices, incidents, or actions, that might be expected to interfere with or prevent continued compliance with any Environmental and Safety Requirements, give rise to any legal obligation or liability, or otherwise form the basis of any Proceeding against or involving the Company, any real property presently or previously owned or used by the Company, or any of its predecessors, or any offsite disposal or treatment site used by the Company or any of its predecessors under any Environmental and Safety Requirements or related common law theories.  All goods, either previously sold by the Company, or currently in the Company's inventory, were and are in compliance with all applicable Laws and specifications therefor.

2.16    **[Reserved]**.

2.17    **[Reserved]**.

2.18    **[Reserved]**.

2.19    **Labor Relations**.  Set forth on **Schedule 2.19** is a list of each of the employees of the Company, setting forth each such person's name, title, employment (or consultant, as the case may be) commencement date, current annual rate of compensation and total compensation (including bonuses) for the fiscal year ended March 31, 2014 and for the thirteen (13) month period ended April 30, 2015.  Other than a projected increase of approximately $25,000 in the aggregate to the monthly compensation of the Company's employees planned to take effect after the date hereof and as set forth on **Schedule 2.19**, the Company has not agreed in writing to increase the current compensation level of any of the employees.   No strike or union organizational activity has occurred at any time since January 1, 2013 or is pending or, to the Company's Knowledge, threatened against the Company.  To the Company's Knowledge, no employee has, in connection with his or her performance of services on behalf of the Company, breached any restrictive covenant or any other obligation that he or she owes to any third party.  No employee is currently on short-term disability or long-term disability or on any other leave of absence.

2.20    **Transactions with Affiliates**.  Except ordinary course interactions between the ESOP and the Company and as otherwise described on **Schedule 2.20**, since January 1, 2013, the Company has not engaged in any Affiliate Transactions.  An "**Affiliate Transaction**" is any contract, agreement, arrangement, commitment or transaction between the Company, on the one hand, and (a) any Affiliate of the Company (including the Company's directors, employees and officers), (b) any Stockholder or his, her, or its Affiliates, (c) any participant of the ESOP or the ESOP Trustee, (d) any family members or any trust for the benefit of any Stockholder or any family members thereof, and (e) any entity controlled by any such Person or Persons or any entity in which any such Person or Persons own, collectively, ten percent (10%) or more of the Company's authorized and outstanding capital stock, on the other hand.  Except as set forth on **Schedule 2.20**, all obligations of the Company with respect to all Affiliate Transactions, including, but not limited to, any outstanding accounts payable, have been satisfied, discharged and terminated and the Company has no further liability in respect of any Affiliate Transaction.

2.21   **Real Property**.  The facilities and real property located at 1123 1st Avenue E, Newton, IA 50208 is the only real property used by the Company (the "**Company Real Property**").

2.22   **Warranties**.  Each product or service, manufactured, sold, licensed, leased, or delivered by the Company is and has been manufactured, sold, licensed, leased, or delivered in material conformity with all applicable contractual commitments and all applicable express and implied warranties, and the Company does not have any liability (and to the Company's Knowledge there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) for replacement or repair thereof or other damages, liability or obligations in connection therewith, in excess of the reserve for warranty claims set forth on the face of balance sheet as of the Latest Balance Sheet Date (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company. No product or service sold, licensed, leased, or delivered by the Company is subject to any material guaranty, warranty, or other indemnity, except for any guaranty, warranty or other indemnity that is imposed by law.

2.23   **Product Liability**.  No product liability or other tort claims have been made, or to the Company's Knowledge threatened, against the Company related to products sold by the Company or its suppliers since January 1, 2012 or that is otherwise pending.  There are no defects in the design or manufacture of products sold by the Company or its suppliers that could form the basis for a cause of action for product liability against the Company.

2.24   **[Reserved]**.

2.25   **Customers, Suppliers and Employees**. Notwithstanding anything in this **Section 2.25** to the contrary, the Company only represents and warrants to Buyer that the information contained in a Disclosure Schedule provided in this **Section 2.25** is complete and accurate if such information relates to a time prior to March 31, 2014.  For the information contained in a Disclosure Schedule provided in this **Section 2.25** that relates to a time after March 31, 2014, the Company represents and warrants that such information is complete and accurate to the Company's Knowledge.

(a)   **Schedule 2.25(a)** sets forth complete and accurate lists by aggregate dollar value of sales made or services provided during each of the periods from April 1, 2012 through March 31, 2013, April 1, 2013 through March 31, 2014, April 1, 2014 through March 31, 2015, and April 1, 2015 through April 30, 2015 to the twenty (20) largest customers of the Business during each such period and the aggregate dollar value of sales to each such customer during such period. Except as stated on **Schedule 2.25(a)**, as of the close of business on the business day immediately prior to the date hereof, no such customer (i) has canceled or otherwise terminated or materially and adversely modified, or to the Company's Knowledge, threatened to cancel or otherwise terminate or materially and adversely modify, its relationship with the Company or (ii) to the Company's Knowledge, is threatened with bankruptcy or insolvency.

(b)   **Schedule 2.25(b)** sets forth a complete and accurate list of the twenty (20) largest suppliers to the Company in connection with the Business (in terms of aggregate

dollar value of purchases by the Company from such suppliers during each of the periods from April 1, 2012 through March 31, 2013, April 1, 2013 through March 31, 2014, April 1, 2014 through March 31, 2015, and April 1, 2015 through April 30, 2015) and the aggregate dollar value of purchases from each such supplier during such period.  Except as stated on **Schedule 2.25(b)**, as of the close of business on the business day immediately prior to the date hereof, no such supplier has canceled or otherwise terminated or materially and adversely modified, or threatened in writing to cancel or terminate, its relationship with the Company.  Except as stated on **Schedule 2.25(b)**, as of the close of business on the business day immediately prior to the date hereof, the Company has not received any notice, nor does the Company have Knowledge, that any such supplier (i) intends to cancel or otherwise terminate or materially adversely modify its relationship with the Company on account of the transactions contemplated by this Agreement, the Transaction Documents or otherwise, or (ii) is threatened with bankruptcy or insolvency.  The Company has not received any discount or other price concession from any such supplier to the Business as a result of, or in connection with, the Company or any of its Affiliates providing any financial accommodation to such supplier.

(c)     Except as set forth on **Schedule 2.25(c)**, as of the close of business on the business day immediately prior to the date hereof, there is no existing dispute between the Company, on the one hand, and any customer, supplier or Account Executive on the other hand.  Except as set forth on **Schedule 2.25(c)**, the Company has not granted or agreed to provide any sales, trade or product promotion allowances, rebates or similar product promotions or incentives, and the Company does not have any liability or obligation with respect to any of the foregoing.

(d)     **Schedule 2.25(d)** sets forth a complete and accurate list of all sales personnel of the Company (collectively, the "**Account Executives**").  All of such Account Executives are (i) compensated as set forth on **Schedule 2.25(d)**, (ii) except as set forth on **Schedule 2.25(d)**, personnel classified as independent contractors of the Company in accordance with applicable Law, and (iii) paid commission as binding purchase orders are received and booked by the Company, rather than upon billing the customer or collecting from the customer. **Schedule 2.25(d)** sets forth the revenues and commissions of each such Account Executive for each of the fiscal years ended March 31, 2013, 2014, and 2015 and for the one (1) month period ended April 30, 2015.  Except as stated on **Schedule 2.25(d)**, as of the close of business on the business day immediately prior to the date hereof, the Company has not received any notice, nor does the Company have Knowledge, that any Account Executive intends to terminate or materially adversely modify its relationship with the Company whether on account of the transactions contemplated by this Agreement, the Transaction Documents or otherwise.  Except as set forth on **Schedule 2.25(d)**, as of the close of business on the business day immediately prior to the date hereof, the Company does not have any material dispute with any Account Executives of the Company.

(e)     **Schedule 2.25(e)** correctly and completely lists all open orders with customers of the Company for sale of product as of the close of business on the business day immediately prior to the date hereof and, if applicable, the amount of commissions that the Company has advanced to its employees and independent contractors in connection with such open orders (the "**Commission Advances Amount**").

(f)     Since approximately May 15, 2015, the Company has delivered and shall continue to timely deliver until Closing daily, weekly and monthly reports of the Company's new orders, including information regarding customers, Account Executives, Cost of Goods Sold, planned shipment dates, and commissions (the "**Open Order Reports**") to Buyer.  The delivered Open Order Reports are complete and accurate in all respects and the Company has provided notice to Buyer if a change in facts and circumstances rendered any delivered Open Order Report inaccurate or incomplete.

2.26     **Disclosure Schedules**.     The schedules identified in this Agreement (the "**Disclosure Schedules**") are incorporated herein by reference and made a part hereof. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item on any of the Disclosure Schedules shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty references the existence of the schedule and the schedule references the document or other item itself).  If and to the extent any information required to be furnished in any Disclosure Schedule is contained in any other Disclosure Schedule with such specificity (whether or not specific cross references are given) so that it is reasonably apparent on its face that such information is also applicable to any other Disclosure Schedule, such information shall be deemed to be included in all of the Disclosure Schedules in which such information is required to be included.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Company that as of the date hereof and as of the Closing Date:

3.1     **Buyer Organization**.  Buyer is a corporation duly organized and validly existing under the laws of the State of Delaware.

3.2     **Authorization**.     The execution and delivery of this Agreement and the Transaction Documents to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary organizational action and no other act or proceeding on the part of Buyer is necessary.  Buyer has all requisite power and authority to enter into, execute and deliver this Agreement and the Transaction Documents to which Buyer is a party and to perform its obligations hereunder and thereunder.  Assuming the due authorization, execution and delivery hereof by the Company, this Agreement and the Transaction Documents to which Buyer is a party constitute the valid and legally binding obligations of Buyer, enforceable in accordance with their terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and the availability of equitable remedies.

3.3     **No Violation**.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated herein and therein by Buyer do not and will not (a) violate any

Laws of any court, administrative agency, or Governmental Authority; or (b) violate any provision of the certificate of incorporation or bylaws of Buyer.

3.4    **Consents and Approvals**.    No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority (other than approval of the Bankruptcy Court) is required to be made or obtained by Buyer in connection with Buyer's authorization, execution and delivery of this Agreement or the Transaction Documents to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby.

3.5    **No Brokers or Finders**.    Neither Buyer nor any Affiliate thereof has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement for which the Company may be liable.

## ARTICLE IV

## CONDITIONS TO CLOSING

4.1    **Conditions Precedent to Parties' Obligations**.    The obligations of Buyer and the Company under this Agreement are expressly subject to the fulfillment or express written waiver by the Buyer and the Company (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement) of the following conditions at the Closing:

(a)    **Governmental Approvals**.    All authorizations, consents, filings and approvals, in each case from any Governmental Authority, necessary to permit the parties to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the parties, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(b)    **No Order**.    No Order shall be issued by any Governmental Authority restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

4.2    **Conditions Precedent to Buyer's Obligations**.    The obligation of Buyer to consummate the transaction contemplated by this Agreement is expressly subject to the fulfillment or express written waiver by Buyer of the following conditions at the Closing.

(a)    **Representations and Warranties**.    (i) Each of the Fundamental Representations shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of such Closing Date and (ii) each of the other representations and warranties of the Company set forth in **Article II** shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date as if made on and as of such Closing Date (other than in the case of any representation and warranty that is

given as of a particular date, in which case such representation and warranty shall be true as of such date), in each case of this clause (ii), without giving effect to any "material," "in all material respects," or "material adverse effect" (or any correlative terms or similar qualifies) contained in such representations and warranties.

(b)    **No Material Adverse Effect**. Since the date of the this Agreement, no change, event, occurrence, effect, development, condition, circumstance, matter or state of facts shall have occurred or shall exist or be continuing that has had, or would reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the assets, business, liabilities, properties, results of operations or condition (financial or otherwise) of the Company, taken as a whole.

(c)    **Bankruptcy Condition.**

(i)    The Bid Procedures Order shall have been entered on the docket of the Bankruptcy Court no later than the Bid Procedures Order Deadline Date. The Sale Order shall have been entered on the docket of the Bankruptcy Court no later than the Sale Order Deadline and shall have become a Final Order.

(ii)    The Sale Order shall approve and authorize the assumption and assignment of the Assumed Contracts, and the Assumed Contracts shall have been actually assumed and assigned to Buyer such that the Assumed Contracts shall be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

(iii)    The Bid Procedures Order shall be in form and substance acceptable to Buyer in its sole discretion.

(i)    Nothing in this Agreement shall preclude Buyer and the Company from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders. No notice of such waiver of this or any other condition to Closing need be given except to the Company, any official committee appointed in the Chapter 11 Case and the United States Trustee, it being the intention of the parties hereto that Buyer shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of Final Orders.

(d)    **Credit Bid Approval**.   The Bankruptcy Court shall have entered an Order, binding on all parties in interest in the Chapter 11 Case (which Order may be the DIP Order or Sale Order) unconditionally allowing (i) a Claim by the DIP Lenders in an amount equal to the DIP Amount and (ii) a Claim by the Prepetition Loan Lenders in an amount equal to the Prepetition Loan Lenders' claims under the Prepetition Loan Agreement, and authorizing and approving any credit bid or series of credit bids by the DIP Lenders and the Prepetition Loan Lenders contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code.

(e)      **Covenant Compliance**.  The Company shall have complied in all material respects, as of the Closing, with all obligations contained in this Agreement that by the terms hereof are required to be complied with by each of them on or before the Closing Date.

(f)      **Compliance Certificate**.  Buyer shall have received a certificate duly authorized and executed and delivered by the Company's Chief Executive Officer, dated as of the Closing Date, certifying as to the satisfaction of the matters set forth in **Sections 4.2(a)**, **4.2(b)** and **4.2(e)**.

(g)      **No Injunction**.  There shall not be any injunction, writ, temporary restraining order or other order of any court or Governmental Authority restraining or invalidating the transactions contemplated by this Agreement and no Proceeding seeking the foregoing shall be pending.

(h)      **Required Consents**.  All of the approvals and consents listed on **Schedule 2.4** shall have been obtained.

(i)      **Tax Certificate**.  The Company shall have delivered or caused to be delivered to the Buyer a certification to the effect that the Company is not a "foreign person" within the meaning of Section 1445 of the Code.

(j)      **Satisfaction of Closing Deliveries**.  The Buyer shall have received or will receive at Closing each of the Closing Deliveries set forth in **Section 4.2(k)**.

(k)      **Closing Deliveries by the Company**.  At the Closing, the Company shall deliver to Buyer all of the agreements, certificates and other documents and instruments set forth below:

(i)      a certificate executed and delivered by the Secretary of the Company in form and substance reasonably satisfactory to Buyer, attesting and certifying as to: (A) the Articles of Incorporation of the Company (as also certified as of a recent date by the Secretary of State of the State of Iowa); (B) the bylaws of the Company, (C) copies of resolutions of the board of directors and shareholders of the Company adopting and authorizing the transactions contemplated by this Agreement and the Transaction Documents to which the Company is a party; and (D) incumbency and specimen signature certificates with respect to the officers of the Company;

(ii)      a certificate of good standing of the Company issued not earlier than fifteen days prior to the Closing Date by the Secretary of State of the State of Iowa;

(iii)      a bill of sale (the "**Bill of Sale**") and assignment and assumption agreement (the "**Assignment and Assumption Agreement**") in a form to be agreed to by the parties no later than one (1) Business Day prior to the Auction, each duly executed by the Company;

(iv)      a certification to the effect that the Company is not a "foreign person" within the meaning of Section 1445 of the Code;

(v)     copies of all third party approvals and governmental approvals obtained pursuant to **Section 5.19**;

(vi)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all amendments, supplements or modifications thereto);

(vii)     such keys, lock and safe combinations and other similar items as Buyer shall require to obtain immediate and full occupation and control of the Purchased Assets and Company Real Property (subject to the terms and conditions of this Agreement); and

(viii)     evidence of the assignment and registration of all domain names of the Business in the name of Buyer.

4.3     **Conditions Precedent to the Company's Obligations**.  The obligation of the Company to consummate the transactions contemplated by this Agreement is expressly subject to the fulfillment or express written waiver by the Company of the following conditions as of the Closing.

(a)     **Representations and Warranties**. The representations and warranties of Buyer contained in **Article III** shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of such Closing Date, except to the extent the failure of any such representations and warranties to be true and correct has not resulted in, and would not reasonably be expected to result in, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or consummate the transactions contemplated hereby.

(b)     **Covenant Compliance**.  Buyer shall have complied in all material respects, as of the Closing, with all obligations contained in this Agreement that by the terms hereof are required to be complied with by Buyer on or before the Closing Date.

(c)     **No Injunction**.  There shall not be any injunction, writ, temporary restraining order or other order of any court or Governmental Authority restraining or invalidating the transactions contemplated by this Agreement and no Proceeding seeking the foregoing shall be pending.

(d)     **Bankruptcy Court Approval**.  The Bankruptcy Court shall have entered an order (which may be the Sale Order) approving the assumption of this Agreement by the Company and the consummation by the Company of the transactions contemplated herein that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(e)     **Satisfaction of Closing Deliveries**.  The Company shall have received or will receive at Closing each of the Closing Deliveries set forth in **Section 4.3(f)**.

(f)     **Closing Deliveries by Buyer**. At the Closing, Buyer shall deliver all of the agreements, certificates and other documents and instruments set forth below:

(i)     a certificate executed and delivered by the Secretary of the Buyer in form and substance reasonably satisfactory to Company, attesting and certifying as to copies

29

of resolutions of the board of directors of the Company authorizing the transactions contemplated by this Agreement and the Transaction Documents to which the Buyer is a party; and incumbency and specimen signature certificates with respect to the officers of the Company;

(ii)    the Estimated Cash Amount, less the Adjustment Holdback, by wire transfer of immediately available funds, delivered in accordance with this Agreement;

(iii)    100% of the Debt Interests, delivered in accordance with this Agreement;

(iv)    the Bill of Sale, duly executed by Buyer; and

(v)    the Assignment and Assumption Agreement, duly executed by Buyer.

4.4    **Frustration of Conditions**.   Neither Buyer nor the Company may rely on the failure of any condition set forth in **Section 4.1** or **Section 4.3**, respectively, to be satisfied if such failure was caused solely by such party's failure to act in good faith or a breach of or failure to perform or comply with any of its representations, warranties, covenants or other obligations in accordance with the terms of this Agreement.

## ARTICLE V

## COVENANTS AND OTHER AGREEMENTS

5.1    **Access to Information**.   The Company will permit Buyer and its representatives (including its legal counsel, accountants, advisors, financing sources and agents) to have full access, upon reasonable notice and during normal business hours throughout the period prior to the Closing, to (a) the properties, books and records (including tax returns), premises, contracts and documents of the Company, including all financial and operating data and other information concerning the Business and/or the Company, as they may reasonably request, and (b) officers and employees of the Company.   The Company will use its commercially reasonable efforts to maximize the amount of information to which it provides Buyer access, whether by obtaining consent of third parties, entering into confidentiality agreements or otherwise.

5.2    **Restrictive Covenants of Company**.   The parties agree that Buyer is relying on the covenants and agreements set forth in this **5.2**, that without such covenants Buyer would not enter into this Agreement or the transactions contemplated hereby, and that the Purchase Price is sufficient consideration to make the covenants and agreements set forth herein enforceable.

(a)    **Confidentiality**.   The Company recognizes and acknowledges that such party has knowledge of confidential and proprietary information concerning Buyer, the Business and the Company ("**Confidential Information**").   In light of the foregoing, from the date hereof, the Company shall maintain the confidentiality of, and refrain from using or disclosing to any Person, all Confidential Information, except to the extent disclosure of any such information is required by Law or is in the public domain through no act on the part of the Company or its Affiliates or agents.   In the event that any such party reasonably believes after consultation with counsel that it is required by Law to disclose any Confidential Information, such party will

(i) provide Buyer with prompt notice before such disclosure in order that Buyer may attempt to obtain a protective order or other assurance that confidential treatment will be accorded to such Confidential Information and (ii) cooperate with Buyer in attempting to obtain such order or assurance. Buyer acknowledges that Company will disclose certain Confidential Information to Qualified Bidders pursuant to and in accordance with the Bid Procedures Order.

(b) **Publicity**. From and after the Closing, neither the Company nor any Affiliate of the Company shall make any statement or any other expressions on television, radio, the internet or other media or to any third party, including, without limitation, in communications with any customers, vendors, prospects, sales representatives or distributors, which are in any way disparaging of Buyer, the Company, or any of its Affiliates, the products and services of the Company or the Business.

5.3 **Protection of Business Relationships**. After the date hereof and following the Closing, the Company will reasonably cooperate with Buyer in its efforts to continue and maintain for the benefit of the Buyer and the Business those business relationships of the Company existing prior to the Closing and relating to the Business to be operated by Buyer after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, advertisers, customers, suppliers, distributors, representatives, Account Executives and others. The Company will refer to Buyer all inquiries relating to the Business, the Purchased Assets or the Assumed Liabilities and shall permit Buyer to handle all communications whatsoever with respect to the Account Executives. The Company acknowledges the importance of these relationships and neither the Company nor any of its officers, employees or agents shall take any action that would diminish the value of the Purchased Assets after the Closing or that would interfere with the Business after the Closing, including disparaging the name or business of Buyer.

5.4 **Name Change**. On or within three (3) days after the Closing Date, the Company shall have executed and delivered to Buyer such documents and taken such further actions as may be required to change the Company's corporate name and to terminate any and all of the Company's assumed name filings containing the name "Newton Manufacturing Company" (or any derivations or variations thereof), and shall have executed and delivered all necessary filings in, or withdrawals from, all states where the Company is qualified to do business reflecting the Company's name change. Thereafter and forever, the Company and any Affiliates of the Company shall cease any use of the name "Newton Manufacturing Company" or any derivation or variation thereof or any name confusingly similar thereto, except that the foregoing shall not apply solely (i) as required for the Chapter 11 Case or to pursue rights and claims against third parties, (i) in connection with filing of tax returns, insurance claims and any other necessary filings, and (ii) in connection with publishing any notices required by the Bankruptcy Court.

5.5 **Further Assurances; Account Executive Meeting**.

(a) Each of the parties hereto agree that from the date hereof, upon the reasonable request of any other party hereto, it shall execute and deliver, or cause to be executed and delivered, such further instruments and take such other actions as may be necessary to carry out the transactions contemplated by this Agreement and the Transaction Documents or to vest, perfect or confirm ownership of the Purchased Assets and the Business in Buyer. The Company

shall use its commercially reasonable efforts to promptly obtain any consent, approval or order of any Governmental Authority that is required to be obtained or made by the Company, or to avoid any action or proceeding by any Governmental Authority, in connection with the authorization, execution and delivery of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

(b)     On the Petition Date (or such later date as Buyer may determine in its sole discretion), the Company shall deliver via electronic mail (i) the communication in a form agreed to by the parties (the "**AE Communication**") to all Account Executives, which such AE Communication shall include notice of a meeting of the Account Executives (the "**Account Executive Meeting**"), with such meeting to occur as soon as practicable but in no event later than one business day following the AE Communication,  and (ii) the communication in a form agreed to by the parties (the "**Supplier Communication**") to all of the Company's suppliers, which such AE Communication shall include notice of a meeting of the suppliers (the "**Supplier Meeting**" and with the Account Executive Meeting, the "**Stakeholder Meetings**"), with such meeting to occur as soon as practicable but in no event later than one business day following the Suppler Communication. At the Stakeholder Meetings, (i) the Company shall introduce Buyer to describe the transactions contemplated by this Agreement and the Transaction Documents and discuss the strategic plan for the Account Executives and the Company's suppliers and the benefits to the Account Executives and the Company's suppliers that will materialize as a result of the transactions contemplated by this Agreement, and (ii) Buyer's designated representatives will be provided an opportunity to speak with the attendees of the Stakeholder Meetings regarding the transactions contemplated by this Agreement and the benefits thereof.   The Company shall cooperate in all respects with Buyer in preparing for and conducting the Stakeholder Meetings.

5.6     **Conduct of Business**.  From the date of this Agreement until the Closing Date or the earlier termination of this Agreement, except as set forth on **Schedule 5.6**, required by Law or the Bankruptcy Court or as consented to prior thereto in writing by Buyer, the Company shall comply with the following covenants.

(a)     **Required Actions**.  The Company shall:

(i)     maintain its legal existence;

(ii)     conduct its business only in the ordinary course consistent with past practice (including by making all capital expenditures consistent with past practice that are necessary to maintain the business);

(iii)     deliver Open Order Reports to Buyer each day for the prior business day and immediately notify Buyer of any change in facts or circumstance that renders a delivered Open Order Report inaccurate or incomplete;

(iv)     use commercially reasonable efforts to maintain its business relationships (including those with customers, suppliers, contractors and employees) in good standing;

       (v)      use commercially reasonable efforts to preserve its goodwill and preserve its assets in good operating condition (subject to normal wear and tear);

       (vi)      maintain its Insurance Policies in full force and effect; and

       (vii)      comply in all material respects with Laws applicable to it.

     (b)      **Prohibited Actions**. The Company shall not:

       (i)      effect any change to the Company's Organizational Documents except in accordance with this Agreement;

       (ii)      accelerate the payment of any accounts payable, delay the collection of any accounts receivables or sell, license, transfer or convey any assets of the Business (other than the sale of Inventory in the ordinary course of business);

       (iii)      pay any commissions other than in the ordinary course;

       (iv)      acquire, lease, license, sell, transfer, abandon, permit to lapse, assign or dispose of any properties or assets, tangible or intangible, in each case, that are or would be Purchased Assets;

       (v)      subject any of its properties or assets to any Lien;

       (vi)      (A) make or declare any dividend or distribution on any of the Company's equity interests; (B) issue, repurchase or redeem or agree to issue, repurchase or redeem any equity interests of the Company or other rights to acquire any equity interests of the Company; or (C) sell, pledge, dispose of, or agree to sell, pledge or dispose of any equity interests of the Company;

       (vii)      modify or amend in any material respect or cancel, terminate, assign or waive any right under any Material Contract (whether pursuant to Section 365 of the Bankruptcy Code or otherwise), or enter into any contract or agreement that would be a Material Contract if entered into prior to the date hereof;

       (viii)      acquire, invest in or finance any business or Person, whether by merger, consolidation, purchase of assets or equity interests, providing of financing or any other manner;

       (ix)      incur or assume, or agree to incur or assume, any additional Indebtedness;

       (x)      initiate, settle or compromise any Proceeding or waive any rights or claims of material value; or

       (xi)      commit to do any of the foregoing.

Notwithstanding the foregoing, the Company shall retain operational control of the Business at all times prior to Closing and in no manner do the parties to this Agreement intend otherwise.

5.7     **Transfer Taxes**.  All sales, use, transfer, documentary, stamp, registration, bulk sales and other similar Taxes that are payable in connection with the transactions contemplated by this Agreement shall be borne equally by the Company and Buyer.  The party required by applicable Laws to file any Tax returns and other documentation with respect to any such taxes shall prepare and file such tax returns and Buyer and the Company shall each, and shall each cause its Affiliates to, cooperate in the timely preparation and filing of, and join in the execution of, any such tax returns and other documentation.

5.8     **Bankruptcy Actions**.

(a)     On the Petition Date, the Company shall file a voluntary petition for relief under the Bankruptcy Code with the Bankruptcy Court.

(b)     On the Petition Date, the Company shall file with the Bankruptcy Court a motion for entry of the Bid Procedures Order and approval of the transaction contemplated hereby in a form consented to by Buyer in its sole discretion (the "**Sale Motion**").

(c)     Buyer shall provide debtor-in-possession financing to the Company on the terms and conditions set forth in the DIP Credit Amendment to the Prepetition Loan Agreement; provided, that Buyer's obligation to provide such financing is conditioned upon the entry of the DIP Order.

(d)     The Company shall: (i) obtain entry of the Bid Procedures Order by the Bid Procedures Order Deadline Date, (ii) ensure that the Auction (to the extent required by the Bankruptcy Court), during which the Company will solicit Bids from Qualified Bidders for the sale of the Purchased Assets, is held in accordance with the procedures set forth in the Bid Procedures Order, (iii) obtain entry of the Sale Order by no later than the Sale Order Deadline, and (iv) consummate the Closing on or before the Closing Date Deadline.

(e)     The Company shall deliver or cause to be delivered to Buyer for review and comment all documents to be filed on behalf of the Company with the Bankruptcy Court, including all motions, applications, petitions, schedules and supporting papers prepared by the Company (including forms of Orders and Notices to interested parties) that relate to the transactions contemplated in this Agreement prior to the filing thereof in the Chapter 11 Case as soon as commercially reasonable and in any event (i) for filings to be made on the Petition Date, no later than 5:00 p.m. C.T. on May 30, 2015, and (ii) for filings to be made after the Petition Date, not less than two (2) Business Days prior to filing.  All motions, applications, petitions, schedules and supporting papers prepared by the Company and relating (directly or indirectly) to the transactions contemplated by this Agreement to be filed on behalf of the Company after the date hereof must be reasonably satisfactory in form and substance to Buyer in its own discretion.

(f)     Buyer and the Company each agree that they will promptly take such actions as are reasonably requested by the other to assist in obtaining entry of the Sale Order and the Bid Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances

of performance of their respective obligations under this Agreement and the Transaction Documents and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

5.9    **Other Bids**.  Buyer acknowledges that, pursuant to the Bid Procedures Order, and after entry of the Bid Procedures Order on the Bankruptcy Court's docket, the Company will adhere to and follow the Bid Procedures as approved by the Bankruptcy Court; provided, however, that, following completion of the Auction until the Closing (in the event that Buyer is selected as the winning bidder), the Company shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Alternative Transaction or participate in any negotiations or discussions with respect to any Alternative Transaction, and the Company shall not, and shall cause its Affiliates not to, (i) execute an agreement with respect to an Alternative Transaction or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

5.10    **Bankruptcy Matters**.

(a)    The Company and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts are subject to Bankruptcy Court approval. The Company and Buyer acknowledge that (i) to obtain such approval, the Company must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance under the to-be-assigned Assumed Contracts.

(b)    In the event an appeal is taken or a stay pending appeal is requested, from either the Bid Procedures Order or the Sale Order, the Company shall immediately notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related Notice of appeal or Order of stay. The Company shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders.

(c)    From and after the date of this Agreement, the Company shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bid Procedures Order or this Agreement. If Buyer is the Successful Bidder at the Auction, the Company shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

5.11    **503 Liabilities**.  From and after the date of this Agreement and through the Closing, and subject to the approval of the Bankruptcy Court, the Company shall pay the 503 Liabilities in the ordinary course of business and in any event in accordance with their applicable terms.

5.12    **Deposit Claims**.  **Schedule 5.12** sets forth a complete and accurate list of the amounts of customer deposits and prepayments (the "**Customer Deposits**"), listed by customer

(collectively, the "**Deposit Holders**"), as of the most recent date available on the date hereof and which shall be recalculated by Buyer prior to Closing as of the Calculation Time.  From and after the date of this Agreement and through the conclusion of the Chapter 11 Case, Buyer shall reimburse the Company for the amount any such Deposit Holder is entitled to as an unsecured creditor of the Company and as determined by the Bankruptcy Court in the Chapter 11 Case; provided, that (a) such Deposit Holder has filed a valid proof of claim for such Customer Deposit with the Bankruptcy Court, (b) the amount set forth on the proof of claim does not exceed the amount of the Customer Deposit as set forth on **Schedule 5.12**, (c) the Bankruptcy Court has approved of the Company's plan with respect to payment of general unsecured creditors and (d) such Deposit Holder is only receiving its pro rata share of the amount allocated to the general unsecured creditor class on payment of such claim.

5.13  **Notification of Certain Matters**.

(a)  Prior to the Closing, the Company will promptly notify Buyer of any actions suits, claims or Proceedings in connection with the transactions contemplated by this Agreement or the Transaction Documents commenced or, to the Company's Knowledge, threatened against the Company.

(b)  To the extent not already included, the Company shall add Buyer, and Buyer's counsel, to the Company's so-called "Rule 2002 notice list" and otherwise provide notice to Buyer of all matters that are required to be served on the Company's creditors pursuant to the Bankruptcy Code and Rules.

(c)  Notwithstanding anything herein to the contrary, within seven (7) days of the date hereof, the Company shall deliver to Buyer the final versions of the Disclosure Schedules referred to in this Agreement.

5.14  **Assistance**.  If, after the date hereof, any of the parties to this Agreement reasonably requests the participation of any officers, managers, directors, employees, consultants, independent contractors, representatives or advisors of the other party hereto to aid in any Proceedings, the other party hereto shall use its good faith efforts to make such Persons reasonably available to participate in such Proceedings.

5.15  **Employees**.  From the Closing Date until sixty (60) days thereafter, Buyer shall have the option, in its sole discretion, to make offers of employment to any employees of the Company as of the date hereof.  If the Buyer elects to make such an offer of employment, Buyer shall notify the Company of such offer and the Company shall cause the recipient of such offer to be terminated from employment with the Company if the recipient of such offer is then-currently employed by the Company.  The Company acknowledges that no employees are subject to any agreement or obligation with the Company or any Affiliates of the Company that will be effective on or after the Closing Date relating to confidentiality, noncompetition, nonsolicitation or otherwise that would limit or effect such employees' ability to carry on the Business after the Closing or otherwise be employed by Buyer.  Except as provided in **Section 5.16** below, the Company shall be liable and shall hold Buyer harmless from any Severance Payments or other liability (including pursuant to the WARN Act) resulting from such termination.

5.16    **Post-Closing Assistance; Transition**.

(a)    For ninety (90) days following the Closing Date or as may be earlier terminated by Buyer (in each case, the "**Transition Period**"), the Company shall make available to Buyer the services of the employees of the Company, as set forth on **Schedule 5.16(a)** (the "**Transitional Employees**") to the extent still employed by the Company.  The Company shall make commercially reasonable efforts to maintain the employment of each Transitional Employee during the Transition Period.  During a Transitional Employee's Transition Period, such Transitional Employee shall perform services reasonably requested by Buyer consistent with the services provided to the Company prior to Closing and other services necessary to transition the Business to Buyer (the "**Transition Services**").  Such Transition Services shall be provided by the Transitional Employees on the Company Real Property, unless Buyer has specifically consented otherwise.  Buyer shall reimburse the Company for its out of pocket costs of providing the Transition Services, which costs shall be limited to base salary, payroll taxes, benefit cost (other than (i) benefit costs related to the Company's self-insured health benefits, and (ii) severance benefits) and other ordinary course, out-of-pocket, documented expenses related to the Transitional Employees in an amount consistent with the period prior to Closing (the "**Company Transition Costs**").  It is understood by the Parties that any such Transitional Employee rendering services to Buyer pursuant to this **Section 5.16**, shall be deemed an employee with respect to the Company, and shall not be an employee or independent contractor with respect to Buyer.  The Company shall use commercially reasonable efforts to continue to employ the Transitional Employees during such Transitional Employee's Transition Period and shall only use such Transitional Employee during the Transition Period to perform Transition Services.

(b)    No later than the Closing Date, Buyer shall provide to the Company a list of Transitional Employees, as set forth on **Schedule 5.16(b)** (the "**Bonus Eligible Employees**"), that will be eligible for individualized transition bonuses (the "**Transition Bonuses**").  The terms and conditions of the Transition Bonuses shall be determined by Buyer in its sole discretion; provided, that, in addition to any other terms and conditions the Buyer requires, a Bonus Eligible Employee shall only be eligible to receive the Transition Bonus after executing and delivering an agreement to the Company in a form to be delivered to the Company no later than one (1) Business Day prior to the Auction.  The Company shall make all such payments through the Company's payroll system; provided, that Buyer reimburses the Company for the Company's portion of any payroll Taxes.

5.17    **Use of Company Facilities**.  From the Closing Date until ninety (90) days thereafter (the "**Use Period**"), without further consideration other than what is explicitly provided for in this Agreement, the Company shall provide Buyer and its Affiliates and representatives with access to and use of the Company Real Property for the operation of the Business in a manner consistent with past practice of the Company for the twelve months prior to the date hereof and as Buyer may from time to time reasonably request.  All Transition Services shall be performed by the Transitional Employees on Company Real Property, unless Buyer has specifically consented otherwise. Notwithstanding the foregoing, Buyer shall use its commercially reasonable efforts to vacate the Company Real Property prior to expiration of the Use Period.  During the Use Period, Buyer shall pay for the reasonable, ordinary course expenses for utilities and maintenance incurred in connection with the Buyer's use of the Company Real

Property (collectively, the "**Use Expenses**"); <u>provided</u>, that the Use Expenses shall not exceed $20,000 in any month.

5.18    **Use of Company Systems**.  From and after the Closing, the Company and Buyer shall cooperate to make available to both Parties the Company Systems in a manner that is reasonable for the parties to continue to have access thereto.

5.19    **Consents and Approvals**.  The Company and, as applicable, Buyer, shall, at their sole cost and expense, use reasonable best efforts (i) solely in the case of the Company, to obtain all necessary consents and approvals, as reasonably requested by Buyer, to consummate the purchase and sale of the Purchased Assets and the assignment of the Assumed Liabilities, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including obtaining entry of the Bid Procedures Order and Sale Order without modification except as Buyer may consent, (ii) solely in the case of the Company, to obtain, as requested by Buyer, all required consents and approvals (if any) necessary to assign and transfer the Assumed Contracts and the Company's Permits to Buyer at Closing and, to the extent that one (1) or more of the Company's Permits or any Assumed Contracts are not transferable, to assist Buyer, at Buyer's sole cost, in obtaining replacements therefor. In the event that any of the Company's Permits or any Assumed Contracts are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits, Assumed Contracts, consents and approvals to transfer, or replacements therefor, are obtainable after the Closing, the Company shall continue to use reasonable best efforts in cooperation with Buyer after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits or Assumed Contracts after Closing and shall do all things necessary to give Buyer the benefits that would be obtained under such Permits and Assumed Contracts, in each case at Buyer's sole cost and expense. Buyer shall give any other notices to, make any other filings with, and use reasonable best efforts to cooperate with the Company to obtain, any other authorizations, consents and approvals in connection with the matters contemplated by this **Section 5.19**. Each of the parties shall give any other notices to, make any other required filings with, and use commercially reasonable best efforts to obtain, any other required authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement.

5.20    **Accounts Receivable Collections**.  After the Closing, the Company shall permit, and hereby authorizes, Buyer to collect, in the name of the Company, and shall not attempt to collect, Accounts Receivable and to endorse with the name of the Company for deposit in Buyer's account any checks or drafts received in payment thereof.  The Company shall promptly deliver to Buyer any cash, checks or other property that it may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of the Purchased Assets. Buyer shall use its commercially reasonable efforts consistent with Buyer's ordinary business practices when engaging in such collection efforts.

5.21    **Disclosure Schedule Supplements**.  From time to time prior to the Closing, Company shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation

or warranty contained in this Agreement, including for purposes of the termination rights contained in this Agreement or of determining whether or not the conditions set forth in **Section 4.2** have been satisfied.

## ARTICLE VI

## TERMINATION

6.1 **Termination**. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of the Company and Buyer;

(b) by Buyer, if (i) the representations and warranties of the Company set forth in this Agreement shall not be true and correct to the extent that the conditions to Closing set forth in **Section 4.1** would not be satisfied, or the Company shall have breached or failed to perform any of their respective obligations, covenants or agreements under this Agreement to the extent that the conditions to Closing set forth in **Section 4.1** would not be satisfied, and (ii) such breach, failure or misrepresentation (A) cannot be cured by the Closing Date or (B) if curable, is not cured within fifteen (15) days after Buyer gives the Company written notice identifying such breach, failure or misrepresentation;

(c) by the Company, if (i) any of the representations and warranties of Buyer set forth in this Agreement shall not be true and correct to the extent that the condition to Closing set forth in **Section 4.3** would not be satisfied, or if Buyer shall have breached or failed to perform any of its obligations, covenants or agreements under this Agreement to the extent that the condition to Closing set forth in **Section 4.3** would not be satisfied, and (ii) such breach, failure or misrepresentation (A) cannot be cured by the Closing Date or (B) if curable, is not cured within fifteen (15) days after the Company gives Buyer written notice identifying in reasonable detail such breach, failure or misrepresentation;

(d) by either the Company or Buyer, if any court or Governmental Authority has issued a Final Order, decree or ruling restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(e) by Buyer (provided that it is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in **Section 4.2** has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied) or the Closing Date Deadline;

(f) by the Company (provided that it is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if the Company shall have reasonably determined that one (1) or more conditions set forth in **Section 4.3** has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied) or the Closing Date Deadline; and

(g)     by the Company, if  (i) any Person other than Buyer is designated as the Successful Bidder of the Auction, (ii) the Company seeks or supports Bankruptcy Court approval of an Alternative Transaction (other than to or by Buyer) or (iii) executes and delivers a written agreement or understanding of any kind with respect to an Alternative Transaction;

(h)     by Buyer or the Company, if the Bankruptcy Court enters an order approving any Alternative Transaction (other than the sale of the Purchased Assets to Buyer);

(i)     by Buyer (i) if the Bankruptcy Court does not enter the Bid Procedures Order by the Bid Procedures Order Deadline Date (or such later date as Buyer may determine in its sole discretion), or (ii) if following the entry of the Bid Procedures Order but prior to the entry of the Sale Order, the Bid Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(j)     by Buyer, if the Company fails to have held the Auction by the Auction Deadline Date (or such later date as Buyer may determine in its sole discretion);

(k)     by Buyer (i) if the Bankruptcy Court does not enter the Sale Order by the Sale Order Deadline (provided that Buyer may not terminate this Agreement pursuant to this **Section 6.1(k)(i)** if Buyer is then in material breach of any provision of this Agreement and such breach is the primary cause of such failure to enter the Sale Order), or (ii) on or after the date the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(l)     by Buyer ten (10) Business Days following a Default or Event of Default (as defined in the DIP Credit Amendment) under the DIP Facility (unless cured or waived by the DIP Lenders and, with respect to this Agreement, by Buyer) whereby the DIP Lenders accelerate the amounts due under the DIP Facility (and specifically excluding any full refinancing of the DIP Facility); provided that (i) this termination right shall not include a Default or Event of Default and associated acceleration due to a non-intentional technical breach of the DIP Budget and (ii) if the DIP Facility is terminated pursuant to a Default or Event of Default occurring because of a breach of the DIP Budget, neither the Buyer nor its Affiliates shall acquire the Purchased Assets pursuant to the exercise of remedies under the DIP Credit Amendment or applicable Law and instead shall consummate such transaction pursuant to this Agreement subject to the satisfaction or waiver of all conditions to closing set forth in **Article IV** of this Agreement in accordance with their terms; or

(m)     by Buyer if the Chapter 11 Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for the Company and such trustee rejects the transactions contemplated by this Agreement;

(n)     by Buyer if, after using its reasonably best good faith efforts, Buyer fails to acquire all outstanding amounts owed by the Company under the Prepetition Loan Agreement prior to the Petition Date;

(o)      by Buyer if, prior to the Diligence Deadline, Buyer is not satisfied in all respects and in its sole discretion with the results of its ongoing due diligence investigation of the business, assets, operations, properties, financial condition, contingent liabilities, prospects and material agreements of the Company, the Purchased Assets, the employees and Account Executives (including the ability of Buyer to hire or engage such Persons); and

(p)      by Buyer, if the Closing has not occurred by the date that is forty-five (45) days from the date of this Agreement (the "**Closing Date Deadline**") or such later date, if any, as the Company and the Buyer may agree in writing.

6.2      **Breakup Fee and Expense Reimbursement**.

(a)      Upon the first to occur of the date the Company consummates (i) an Alternative Transaction or (ii) a Chapter 11 plan (other than a "liquidating" plan, except one in connection with or as a result of an Alternative Transaction or one in lieu thereof which accomplishes a comparable result) pursuant to the Bankruptcy Code, the Company shall immediately pay (in cash) to Buyer a breakup fee in an amount equal to $200,000 (the "**Breakup Fee**") and Expense Reimbursement; provided, however, that the Breakup Fee shall not be payable to Buyer if this Agreement has been terminated by the Company pursuant to **Section 6.1(c)**.

(b)      If this Agreement is terminated for any reason other than by the Company pursuant to **Section 6.1(c)**, the Company shall immediately upon demand from time to time pay (in cash) to Buyer an amount equal to $200,000 (the "**Expense Reimbursement**").

(c)      The Company's obligation to pay the Breakup Fee and the Expense Reimbursement pursuant to this **Section 6.2** shall survive termination of this Agreement and shall constitute a super-priority administrative expense of the Company (which shall be a super-priority administrative expense claim senior to all other administrative expense claims and payable out of the Company's cash or other collateral of the Company under Section 364(c)(1) of the Bankruptcy Code) (subject to the Carve-Out).

(d)      The parties acknowledge that the agreements contained in this **Section 6.2** are an integral part of the transactions contemplated by this Agreement and constitute liquidated damages and not a penalty, and that, without these agreements, Buyer would not have entered into this Agreement.

6.3      **Effect of Termination; Limitation of Liability**.

(a)      If this Agreement is terminated pursuant to **Section 6.1**, this Agreement and each Transaction Document shall immediately become void and have no effect and none of the parties hereto shall have any liability (including for costs and expenses incurred by other parties in connection with this Agreement and the transactions contemplated hereby) to any other party hereto with respect to this Agreement, any Transaction Document or the transactions contemplated hereby or thereby (or the failure of such transactions to be consummated), other than with respect to any claims relating to a breach of this Agreement or any Transaction Document prior to the termination of this Agreement.

41

(b)    Notwithstanding anything to the contrary in this **Article VI** or elsewhere in this Agreement, this **Section 6.3**, **Section 5.2**, and **Article VII** shall survive the termination hereof and shall be enforceable by the parties hereto and thereto.

## ARTICLE VII

## MISCELLANEOUS

7.1    **Non-Survival of Representations and Warranties**.    The representations and warranties respectively made by the Company and the Buyer in this Agreement and in any certificate delivered hereunder will expire as of the Closing. Subsequent to Closing, no claim with respect to any breach of any representation or warranty contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against any other party. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

7.2    **Notices**.    All notices, reports, records or other communications that are required or permitted to be given to the parties under this Agreement shall be sufficient in all respects if given in writing and delivered in person, by overnight courier, by registered or certified mail, postage prepaid, return receipt requested, or by email, to the receiving party at the following address:

|                                   |                                      |
|-----------------------------------|--------------------------------------|
| If to the Company:                | Newton Manufacturing Company         |
|                                   | 1123 1st Avenue E                    |
|                                   | Newton, IA 50208                     |
|                                   | Attention:    Mancil Laidig, President |
|                                   | Email:    mlaidig@newtonmfg.com      |
|                                   |                                      |
| with a copy (which shall not      | Davis Brown Law Firm                 |
| constitute notice) to:            | 1300 Davis Brown Tower               |
|                                   | Des Moines, Iowa 50309               |
|                                   | Attention:    Beverly Evans          |
|                                   | Email:    bevevans@davisbrownlaw.com |
|                                   |                                      |
|                                   | Bradshaw, Fowler, Proctor & Fairgrave, P.C. |
|                                   | 801 Grand Avenue, Suite 3700         |
|                                   | Des Moines, Iowa 50309               |
|                                   | Attention:    Jeffrey D. Goetz       |
|                                   | Facsimile:    (515) 246-5808         |
|                                   | Email:    goetz.jeffrey@bradshawlaw.com |

If to Buyer:            HALO Branded Solutions, Inc.
Two Prudential Plaza, Suite 3500
180 North Stetson
Chicago, Illinois 60601
Attention:     Marc S. Simon
Facsimile:     (630) 218-7070
Email:        marc.simon@halo.com

with a copy (which shall not
constitute notice) to:      Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:     Ryan D. Harris, P.C.
Ryan Blaine Bennett
Facsimile:     (312) 984-7700
Email:        ryan.harris@kirkland.com
ryan.bennett@kirkland.com

7.3     **Entire Agreement; Amendment**. This Agreement, including the exhibits and schedules hereto, the Transactions Documents and the instruments and agreements executed in connection herewith and therewith contain all of the terms, conditions and representations and warranties agreed upon by the parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, including the Letter of Intent dated December 16, 2014, but excluding the Mutual Confidentiality Agreement dated November 20, 2014. Notwithstanding anything to the contrary set forth in this Agreement, effective as of the Closing, the terms of the Mutual Confidentiality Agreement dated November 20, 2014 shall be deemed terminated and of no further force and effect. This Agreement shall not be amended or modified except by an agreement in writing duly executed by Buyer and the Company and, if after the Petition Date, approved by the Bankruptcy Court.

7.4     **Counterparts; Deliveries**. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, the Transaction Documents and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

7.5     **No Third Party Beneficiaries**. Nothing in this Agreement, express or implied, is intended to confer any right or remedy under or by reason of this Agreement on any Person other than the parties signatory hereto, the Buyer Indemnified Parties, the Company Indemnified Parties and their respective heirs, representatives, successors and assigns, nor is anything set forth herein intended to affect or discharge the obligation or liability of any third Persons to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action over against any party to this Agreement.

7.6     **Expenses**.  Except as set forth in **Section 6.2**, each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and all documents executed in connection herewith and in closing and carrying out the transactions contemplated hereunder and thereunder including, but not limited to, legal and accounting fees and expenses (collectively, the "**Expenses**").  The Company shall be solely responsible for all sales, transfer, documentary, stamp, recording and similar taxes due with regard to the transactions contemplated by this Agreement.

7.7     **No Waiver**.  No failure of any party to exercise any right or remedy given to such party under this Agreement or otherwise available to such party or to insist upon strict compliance by any other party with its obligations hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of any party's right to demand exact compliance with the terms hereof, unless such waiver is set forth in writing and executed by such party.  Any such written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, set forth therein.

7.8     **Headings**.  The subject headings of articles and sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions.

7.9     **Governing Law**.  This Agreement shall be construed and governed in accordance with the internal laws of the State of Iowa without regard to the principles of conflicting laws.

7.10    **Binding Nature; Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties; except (a) that Buyer may assign any of its rights and obligations hereunder to any Affiliate or Subsidiary of Buyer or to its lender and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Purchased Assets; and (b) as otherwise expressly provided in this Agreement. The Company hereby agrees that Buyer may grant a security interest in their rights and interests hereunder to its lenders, and the Company will sign a consent with respect thereto if so requested by Buyer or its lender, and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary set forth herein, the rights and interests of the Company under this Agreement shall inure to the benefit of any trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code and/or any liquidating trust or any other entity appointed as a successor to the Company pursuant to a confirmed plan under Chapter 11 of the Bankruptcy Code.

7.11    **Waiver of Jury Trial**.  Each of the parties hereto hereby irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement or the transactions or events contemplated hereby or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto. The parties hereto each agree that any and all such claims and causes of action shall be tried by the court without a jury.  Each of the parties hereto further waives any right to seek to

consolidate any such legal proceeding in which a jury trial has been waived with any other legal proceeding in which a jury trial cannot or has not been waived.

7.12    **Construction**.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

7.13    **Public Announcements**.  Except as provided in **Section 5.5(b)**, no party shall make any public announcement or filing with respect to the transactions provided for herein without the prior written consent of Buyer and the Company, unless otherwise required by Law. Except as provided in **Section 5.5(b)**, any press release or other announcement or notice regarding the transactions contemplated by this Agreement shall be mutually agreed to by Buyer and the Company.  Notwithstanding the foregoing, following the Closing (a) Buyer shall in its sole discretion control all communications (including the timing and delivery method of any such communications) between the Company and the Account Executives and (b) the Company (i) shall not, and shall cause its directors, officers and employees to not, communicate with any Account Executive without the consent of Buyer, and (ii) shall, and shall cause its directors, officers and employees to, promptly refer all inquiries from any Account Executive regarding the Company, the Business or the transactions contemplated hereby to Buyer.

7.14    **Specific Performance**.  The Company (on its own behalf and on behalf of the other Company Indemnified Parties) hereby acknowledges and agrees that Buyer would be irreparably damaged in the event any of the Company's covenants or obligations contained in this Agreement was not performed.  Accordingly, in addition to any other right or remedy Buyer may have, Buyer shall be entitled to specific performance of the covenants and obligations of the Company set forth in this Agreement and temporary and permanent injunctive relief to prevent any breach or violation hereof, and no bond or other security will be required from any such Person in connection therewith.  If any action is brought by Buyer to enforce this Agreement or any Transaction Document, the Company (on its own behalf and on behalf of the other Company Indemnified Parties) hereby waives the defense that there is an adequate remedy at law

7.15    **Confidentiality**.  The Buyer and the Company shall treat and hold as confidential all of the terms and conditions of the transactions contemplated by this Agreement and the Transaction Documents; provided, however, that each of the Buyer and the Company may disclose such information to its legal counsel, accountants, financial planners and/or other advisors on an as-needed basis so long as any such Person is bound by a confidentiality obligation with respect thereto.

## ARTICLE VIII

## DEFINITIONS

"**503 Liabilities**" has the meaning set forth in **Section 1.4(a)(i)**.

"**AE Communication**" has the meaning set forth in **Section 5.5(b)**.

"**Account Obligor**" means the party responsible for the liabilities and obligations in connection with any Account Receivable.

"**Adjustment Deficit**" has the meaning set forth in **Section 1.10(e)(ii)**.

"**Adjustment Holdback**" means $100,000.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person, and any officer, director or executive employee of such Person.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law).

"**Alternative Transaction**" means a transaction or series of transactions (other than by Buyer or one of its designated Affiliates), whether by merger, consolidation, business combination, sale of equity interests or assets, tender offer, foreclosure or plan of reorganization or liquidation or otherwise, involving (i) the sale or other disposition of ten percent (10%) or more of the Purchased Assets, (ii) the sale of ten percent (10%) or more of the outstanding shares of capital stock or equity interests of the Company or (iii) a similar transaction or business combination involving one or more third parties and the Company (but excluding sales of inventory in the ordinary course of business);

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 4.2(k)(iii)**.

"**Assumed Contracts**" has the meaning set forth in **Section 1.2(h)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 1.4(a)**.

"**Auction**" means the auction conducted by the Company pursuant to the Bid Procedures Order for substantially all of the Purchased Assets in the event a Qualified Bid is timely received prior to the Bid Deadline (as defined in the Bid Procedures Order).

"**Auction Deadline Date**" means 2:00 p.m. CT on June 25, 2015 or such other date as may be agreed upon in accordance with the Bid Procedures Order.

"**Avoidance Actions**" means any causes of action arising under Chapter 5 of the Bankruptcy Code and any similar state law claims.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Iowa.

"**Bid**" has the meaning as shall be ascribed to such term in the Bid Procedures Order.

46

"**Bid Deadline**" has the meaning set forth in DIP Credit Amendment.

"**Bid Procedures Order**" means the order of the Bankruptcy Court, in the form attached hereto as **Exhibit A** or such other form consented to by Buyer in its sole discretion.

"**Bid Procedures Order Deadline Date**" has the meaning set forth in DIP Credit Amendment.

"**Bill of Sale**" has the meaning set forth in **Section 4.2(k)(iii)**.

"**Board**" means the board of directors of the Company.

"**Bonus Eligible Employees**" has the meaning set forth in **Section 5.16(b)**.

"**Breakup Fee**" has the meaning set forth in **Section 6.2(a)**.

"**Business**" means the Company's and its Affiliates' business of operating a promotional products distributorship engaged in promotional planning, product development, imprinting, distribution, implementation and fulfillment of branded and promotional merchandise.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in the State of Iowa are authorized by Law to close.

"**Calculation Time**" means 11:59 p.m. on the Business Day immediately prior to Closing.

"**Cash Amount**" means (i) $1,000,000 plus (ii) the Closing Eligible Accounts Value plus (iii) the Closing Eligible Inventory Value; minus (vi) the Credit Bid Amount minus (vii) the value of the Assumed Liabilities (other than those Assumed Liabilities described in **Sections 1.4(a)(ii)** and **1.4(a)(iii)**) minus (viii) the aggregate value of the Customer Deposits.

"**Cash Amount Adjustment**" has the meaning set forth in **Section 1.10(e)(iv)**.

"**Cash Amount Certificate**" has the meaning set forth in **Section 1.10**.

"**Carve-Out**" has the meaning set forth in the DIP Credit Amendment.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

"**Chapter 11 Case**" means the case commenced by the Company under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"**Chapter 11 Professionals**" has the meaning set forth in **Section 2.6**.

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in **Section 1.9**.

"**Closing Commission Advances Amount**" means the Commission Advances Amount as of the Closing Date.

"**Closing Date**" has the meaning set forth in **Section 1.9**.

"**Closing Date Deadline**" has the meaning set forth in **Section 6.1(p)**.

"**Closing Eligible Accounts Value**" means 90% of the dollar value amount of Eligible Accounts as of the Closing Date.

"**Closing Eligible Inventory Value**" means 90% of the dollar value amount of Eligible Inventory as of the Closing Date.

"**Closing Vendor Prepaid Amount**" means the Vendor Prepaid Amount as of the Closing Date.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Commission Advances Amount**" has the meaning set forth in **Section 2.25(e)**.

"**Commission Advances Payment**" has the meaning set forth in **Section 1.12(c)**.

"**Company Benefit Plans**" means all Employee Benefit Plans maintained by the Company or to which the Company has made contributions or had any other liability with respect thereto.

"**Company Closing Costs**" means all fees, costs and expenses for any legal, accounting, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by the Company that are in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Case or otherwise and all change of control payments due by the Company to any Person under any plan, agreement or arrangement of the Company, which liability, in each case, is payable or becomes due as a result of the consummation of the transactions contemplated hereby, including all Taxes which are payable by the Company in connection with the payment of such liability.

"**Company's Knowledge**" means the facts or other information known or that would have come known after due inquiry by Mancil Laidig, Jeff Stolp, Dan Marsdon, Kevin Peska and Jayne McKeever.

"**Company Systems**" means the computer systems, including the Software, hardware, networks, historically saved data, interfaces, platforms and related systems currently used in the conduct of the Business (collectively, the "**Company Systems**") by the Company.

"**Contract**" means any agreement, license, contract, commitment or other binding arrangement or understanding, whether written or oral, and, with respect to any Contract to

48

which the Company is a party, such contract which the Company is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"**Cost of Goods Sold**" means the costs associated with an order determined in accordance with Buyer's policies as applicable to all account executives of the Buyer, as such may be in effect from time to time.

"**Credit Bid Amount**" has the meaning set forth in **Section 1.11**.

"**Customer Deposits**" has the meaning set forth in **Section 5.12**.

"**Debt Interests**" means all rights and obligations of any kind of the lenders under the DIP Facility and the Prepetition Loan Facility, in each case as of the Closing Date.

"**Deposit Holders**" has the meaning set forth in **Section 5.12**.

"**Diligence Deadline**" means 5:00 p.m. C.T. on the day prior to the date of the Auction.

"**DIP Amount**" means the sum of all outstanding obligations of any kind under the DIP Facility as of the Closing Date.

"**DIP Budget**" means the budget attached as Exhibit B to the DIP Order.

"**DIP Credit Amendment**" means that certain amendment to the Prepetition Loan Agreement, to be entered into only after entry of the DIP Order by the Bankruptcy Court.

"**DIP Facility**" means the credit facility governed by (i) the Prepetition Loan Agreement as amended by the DIP Credit Amendment and (ii) the DIP Order.

"**DIP Lenders**" means the lenders under the Prepetition Loan Agreement as amended by the DIP Credit Amendment.

"**DIP Order**" means, collectively, those certain interim or final orders entered by the Bankruptcy Court approving the DIP Facility, in the form attached hereto as **Exhibit B** or such other form consent to by Buyer in its sole discretion.

"**Disputed Items**" has the meaning set forth in **Section 1.10(e)**.

"**Disputed Items Notice**" has the meaning set forth in **Section 1.10(e)**.

"**Disclosure Schedules**" has the meaning set forth in **Section 2.26**.

"**Eligible Accounts**" has the meaning set forth in **Section 2.7(e)**.

"**Eligible Inventory**" has the meaning set forth **Section 2.7(c)**.

"**Employee Benefit Plan**" means any of the following (whether written, unwritten or terminated):  (a) any "employee welfare benefit plan," as defined in Section 3(1) of ERISA, including, but not limited to, any medical plan, life insurance plan, short-term or long-term

disability plan, dental plan, and sick leave; (b) any "employee pension benefit plan," as defined in Section 3(2) of ERISA, including, but not limited to, any excess benefit, top hat or deferred compensation plan or any nonqualified deferred compensation or retirement plan or arrangement or any qualified defined contribution or defined benefit plan; (c) the ESOP and any plan, agreement or arrangement associated therewith, or (d) any other plan, policy, program, arrangement or agreement that provides employee benefits or benefits to any current or former employee, dependent, beneficiary, director, independent contractor or like person, including, but not limited to, any severance agreement or plan, personnel policy, vacation time, holiday pay, service award, moving expense reimbursement programs, tool allowance, safety equipment allowance, material fringe benefit plan or program, bonus or incentive plan, stock option, restricted stock, stock bonus or deferred bonus plan, salary reduction, change-of-control or employment agreement (or consulting agreement with a former employee).

"**Environmental and Safety Requirements**" means all federal, state and local laws (including CERCLA and analogous state laws), rules, regulations, ordinances, orders, statutes, actions, policies and requirements relating to public health and safety, worker health and safety, pollution or protection of the environment, all as amended or hereafter amended.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ESOP**" means the Newton Manufacturing Company Employee Stock Ownership Plan with an effective date of April 1, 2010, which is an "employee stock ownership plan" as defined in Section 4975(e)(7) of the Code.

"**ESOP Agreement**" means the Newton Manufacturing Company Employee Stock Ownership Plan and Trust Agreement made with Bankers Trust Company of South Dakota, as trustee of the ESOP.

"**ESOP Liabilities**" means any matter related to (i) the ESOP, (ii) the establishment, administration, management or operation of the ESOP, (iii) claims or rights of the participants and beneficiaries of the ESOP, (iv) the closing of the transactions contemplated by this Agreement as it relates to the ESOP, (v) any audit, investigation or inquiry by any governmental agency relating to the ESOP, or (vi) any other activities carried on by the ESOP; including, without limitation, any Losses attributable to the Company's indemnification of the ESOP Advisor, the ESOP Trustee, or any other fiduciary, administrator or trustee of the ESOP, in connection with his, her or its acts or omissions in administration, management, termination or operation of the ESOP occurring on, after or prior to Closing or which otherwise relate to the closing of the transactions contemplated by this Agreement.

"**ESOP Trustee**" means Bankers Trust Company of South Dakota, the trustee of the ESOP.

"**Estimated Cash Amount**" has the meaning set forth in **Section 1.10(a)**.

"**Estimated Cash Amount Certificate**" has the meaning set forth in **Section 1.10(a)**.

"**Excluded Assets**" has the meaning set forth in **Section 1.3**.

"**Excluded Contracts**" has the meaning set forth in **Section 1.5(b)** hereof.

"**Excluded Liabilities and Obligations**" has the meaning set forth in **Section 1.5.**

"**Expense Reimbursement**" has the meaning set forth in **Section 6.2(b)** hereof.

"**Fees and Expenses**" means all actual reasonable and documented out-of-pocket fees, costs, and expenses of Buyer and its Affiliates incurred in connection with the transactions contemplated by this Agreement, including reasonable attorneys' fees and other professional fees, and reasonable due diligence, transportation, negotiation, duplication, appraisal, audit (including per diems), consultant, search, filing and recording fees, costs and expenses; provided, however, that Fees and Expenses shall not include financing fees payable to Buyer's lenders.

"**Final Cash Amount**" has the meaning set forth in **Section 1.10(e)**.

"**Final Order**" means an Order as to which no appeal, motion for rehearing or reconsideration or a petition for writ of certiorari is pending.

"**Financial Statements**" has the meaning set forth in **Section 2.7(a)**.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession that are applicable to the circumstances from time to time.

"**Governmental Authority**" has the meaning set forth in **Section 2.4**.

"**Guaranty**" means any obligation, contingent or otherwise, of the Company directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person.  The term "guarantee" used as a verb has a corresponding meaning.

"**Hazardous Materials**" means (a) hazardous materials, hazardous substances, extremely hazardous substances, hazardous wastes, infectious wastes, acute hazardous wastes, toxic substances, toxic contaminants or pollutants, as those terms are defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., and any other Environmental and Safety Requirements; (b) petroleum, including crude oil or any fraction thereof that is liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch absolute); (c) any radioactive material, including any source, special nuclear, or by-product material as defined in 42 U.S.C. § 2011 et seq.; (d) asbestos in any form or condition; and (e) any substance that contains regulated levels of polychlorinated biphenyls.

"**Indebtedness**" of any Person means all: (a) indebtedness for borrowed money or funded debt owed by the Company (including without limitation, all loans to any Stockholder), (b) Guaranties, (c) all liabilities of the Company evidenced by notes, bonds or debentures, (d) all liabilities of the Company secured by any Liens, (e) the capitalized portion of lease liabilities of

the Company under any capitalized lease, (f) all liabilities of the Company arising from installment purchases of property or representing the deferred purchase price of property or services in respect of which the Company is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course), (g) any Severance Payments (other than those as provided in **Section 5.16(b)**) and (h) any interest, principal, prepayment penalty, fees, or expenses, to the extent due or owing in respect of those items listed in clauses (a) through (g) above.

"**Independent Accounting Firm**" has the meaning set forth in **Section 1.10(d)**.

"**Ineligible Accounts**" has the meaning set forth in **Section 1.12(a)**.

"**Ineligible A/R Payment**" has the meaning set forth in **Section 1.12(a)**.

"**Ineligible Inventory**" has the meaning set forth in **Section 1.12(b)**.

"**Ineligible Inventory Payment**" has the meaning set forth in **Section 1.12(b)**.

"**Insurance Policies**" means all insurance policies of the Company or otherwise covering the Purchased Assets.

"**Intellectual Property**" means, collectively, in the United States, (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (ii) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) all moral rights and copyrights in any work of authorship (including but not limited to databases, software, and mask works) and all applications, registrations, and renewals in connection therewith, (iv) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, manufacturing and production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (v) computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation) (collectively, "**Software**"), (vi) all other proprietary and intellectual property rights, (vii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), and (viii) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"**Latest Balance Sheet Date**" means the Company's balance sheet as of April 30, 2015.

"**Lien**" or "**Liens**" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of preemption, right of first refusal or other third party right, or Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any

assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee or continuation of the Company or the Business, and (iv) any leasehold interest, license or other right, in favor of a third party or the Company, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unified, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown; provided, however, that Liens shall not include non-exclusive licenses to Company Intellectual Property.

"**material adverse effect**" means any change, effect, event, occurrence, state of facts or development or any combination of such matters that is, or could reasonably be expected to, materially and adversely effect to the business or financial condition of the Business; <u>provided</u>, <u>however</u>, that the following shall not be deemed to constitute a material adverse effect: (i) changes in conditions generally affecting the industry in which the Company operates; (ii) acts of war or terrorism; (iii) general economic conditions, (iv) conditions in the securities or financial markets in general; or (v) any changes in applicable Laws or accounting rules, including GAAP; <u>provided</u>, that in any such case, (x) there is not a disproportionate effect on the Company as compared to the other companies in the industry in which the Company operates, and (y) the act of filing the Chapter 11 Case in and of itself shall not constitute a Material Adverse Effect.

"**Material Contracts**" has the meaning set forth in **Section 2.11**.

"**Measurement Period**" has the meaning set forth in **Section 1.12**.

"**Measurement Period Payment Amount**" has the meaning set forth in **Section 1.12(e)**.

"**Notice**" means any summons, citation, directive, Order, claim, litigation, proceeding, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or any other Governmental Authority, or any other Person, entity or any individual, and shall include the imposition of any Lien on property owned, leased, occupied or used by the Company or the Business pursuant to any Law.

"**offsetting liability**" has the meaning set forth in **Section 2.8(b)**.

"**Open Order Reports**" has the meaning set forth in **Section 2.25(f)**.

"**Order**" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"**Organizational Documents**" means the documents by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs (including any certificate or articles of incorporation or organization, certificate of formation, constitutional documents, by-laws, partnership agreement, limited liability company agreement and operating agreement), in each case, as amended through the date of this Agreement.

"**Patents**" means all letters patent and pending applications for patents of the United States and all reissues, reexaminations, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"**Permits**" means all rights of the Company in and to permits, licenses, registrations, qualifications, approvals and authorizations by or of Governmental Authorities or third parties needed for or used in connection with its operation of the Business, including without limitation, those set forth on **Schedule 2.14**.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation or other entity or any Governmental Authority.

"**Petition Date**" means May 31, 2015, or such earlier date consented to by Buyer in its sole discretion, which shall be the date of the filing of the Chapter 11 petition of the Company.

"**Post-Closing Period**" has the meaning set forth in **Section 1.12**.

"**Prepetition Loan Agreement**" means that certain Promissory Note, dated as of April 1, 2014, by and among the Company, as borrower, and Community Bank, as lender, as amended or otherwise modified prior to the Closing Date and as further amended or otherwise modified from time to time in accordance with the terms thereof, including the DIP Credit Amendment; underline(provided) that if the Buyer or its Affiliates are not the Prepetition Loan Lenders as of the Closing, the use of Prepetition Loan Agreement, Prepetition Loan Facility and Prepetition Loan Lenders shall be deemed stricken from this Agreement and any amounts associated therewith either shall be paid by Buyer in cash to the Company at the Closing or shall be paid as part of the Credit Bid Amount if the Prepetition Loan Agreement was refinanced under the DIP Facility.

"**Prepetition Loan Facility**" means the credit facility governed by the Prepetition Loan Agreement.

"**Prepetition Loan Lenders**" means the lenders under the Prepetition Loan Agreement.

"**Program Customer Websites**" has the meaning set forth in **Section 1.2(f)**.

"**Purchased Equipment**" has the meaning set forth in **Section 1.2(n)**.

"**Purchase Price**" has the meaning set forth in **Section 1.13**.

"**Qualified Bidder**" has the meaning as shall be ascribed to such term in the Bid Procedures Order.

"**Remaining Disputed Items**" has the meaning set forth in **Section 1.10(d)**.

"**Rule**" or "**Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Sale Motion**" has the meaning set forth in **Section 5.8(b)**.

"**Sale Order**" means the Final Order of the Bankruptcy Court, in a form consented to by Buyer in its sole discretion, to be entered by the Bankruptcy Court pursuant to Sections 363, 365 and 1146(c) of the Bankruptcy Code, which Final Order, amongst other approvals, approves the

sale of the Purchased Assets to Buyer free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

"**Sale Order Deadline**" has the meaning set forth in DIP Credit Amendment.

"**Scheduled Contracts**" has the meaning set forth in **Section 1.6(a)**.

"**Severance Payments**" means all severance, stay bonus or change of control payments (whether payable prior to, on or after the Closing Date) that arose under any Employee Benefit Plan of the Company or contract at, in connection with or prior to the Closing Date.

"**Stakeholder Meetings**" has the meaning set forth in **Section 5.5(b)**.

"**Stockholder**" means any holder of capital stock of the Company, including the ESOP.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any manager, management board, managing director or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Successful Bidder**" has the meaning as shall be ascribed to such term in the Bid Procedures Order.

"**Supplier Communication**" has the meaning set forth in **Section 5.5(b)**.

"**Supplier Meeting**" has the meaning set forth in **Section 5.5(b)**.

"**Tax**" means any multi-national, Federal, state, or local or foreign income, gross receipts, franchise, estimated, alternative minimum, add on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, ad valorem, capital stock, social security, unemployment, disability, workers' compensation, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties or additions to Tax or additional amounts in respect of the foregoing; the foregoing shall include any transferee or secondary liability for a Tax and any liability assumed by agreement or arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"**Tax Returns**" means returns, declarations, reports, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax of any party or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Trademarks**" mean, in the United States, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of origin, together with all translations, adaptations, derivations, combinations and renewals thereof.

"**Transition Bonuses**" has the meaning set forth **Section 5.16(b)**.

"**Vendor Prepaid Amount**" has the meaning set forth in **Section 2.7(e)**.

"**Vendor Prepaid Payment**" has the meaning set forth in **Section 1.12(d).**

The following terms are defined in the following Sections:

| | |
|---|---|
| Account Executive Meeting | 5.5(b) |
| Account Executives | 2.25(d) |
| Accounts Receivable | 2.7(d) |
| Affiliate Transaction | 2.20 |
| Agreement | Preamble |
| Books and Records | 1.2(i) |
| Buyer | Preamble |
| Company | Preamble |
| Company Intellectual Property | 2.10(c) |
| Company Real Property | 2.21 |
| Company Transition Costs | 5.16(a) |
| Confidential Information | 5.2(a) |
| Expenses | 7.6 |
| Financial Statements | 2.7(a) |
| Laws | 2.5(b) |
| NetSuite Agreement | 1.2(h) |
| Pella | 1.3(c) |
| Proceedings | 2.12 |
| Purchased Assets | 1.2 |
| Real Property Leases | 2.11(i) |
| Schedule Supplement | 5.21 |
| Transaction Documents | 2.2 |
| Transition Period | 5.16(a) |
| Transition Services | 5.16(a) |
| Transitional Employees | 5.16(a) |
| Use Expenses | 5.17 |

Use Period                                        5.17

*[Signature Page follows.]*

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

<u>**THE COMPANY**</u>:

**NEWTON MANUFACTURING COMPANY**

By: _____
Name:   Mancil R. Laidig, President


<u>**BUYER**</u>:

**HALO BRANDED SOLUTIONS, INC.**

By: _____
Name:  Marc S. Simon, Chief Executive Officer