# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In Re: | ) Case No.  15- |
| | ) |
| **NEWTON MANUFACTURING** | ) Chapter 11 |
| **COMPANY** | ) |
| | ) Honorable |
| Debtor and Debtor in Possession. | ) |
| | ) **FIRST DAY MOTION** |
| 1123 1ST Ave E | ) |
| Newton, IA  50208 | ) **DEBTOR'S <u>EMERGENCY</u> MOTION** |
| | ) **FOR INTERIM AND FINAL ORDERS** |
| EIN:  42-0437950 | ) **(i) APPROVING POSTPETITION** |
| | ) **FINANCING, (ii) AUTHORIZING USE** |
| | ) **OF CASH COLLATERAL, (iii)** |
| | ) **GRANTING SECURITY INTERESTS** |
| | ) **AND SUPERPRIORITY** |
| | ) **ADMINISTRATIVE EXPENSE** |
| | ) **TREATMENT, (iv) PROVIDING** |
| | ) **ADEQUATE PROTECTION, (v)** |
| | ) **MODIFYING AUTOMATIC STAY, (vi)** |
| | ) **GRANTING ADEQUATE** |
| | ) **PROTECTION PURSUANT TO** |
| | ) **SECTIONS 363 AND 364 OF THE** |
| | ) **BANKRUPTCY CODE, AND (vii)** |
| | ) **SETTING FINAL HEARING** |
| | ) |
| _____ | ) No Hearing Set |

Newton Manufacturing Company, ("<u>Newton</u>" or "<u>Debtor</u>"), Debtor and Debtor in Possession herein, by and through its proposed General Reorganization Counsel, Jeffrey D. Goetz, Esq. of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., and pursuant to the provisions of Sections 105, 361, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), respectfully files this Motion for an interim financing order (the "<u>Interim Financing Order</u>") and a final financing order (the "<u>Final Financing

Order") (i) Approving Post-petition Financing, (ii) Authorizing Use of Cash Collateral, (iii)

Granting Security Interests and Superpriority Administrative Expense Treatment, (iv) Providing

Adequate Protection, (v) Modifying Automatic Stay, (vi) Granting Adequate Protection Pursuant

to Sections 363 and 364 of the Bankruptcy Code, and (vii) Setting Final Hearing (the "Motion"),

and would show this Honorable Court as follows:

## BACKGROUND

1.     As more fully discussed herein and summarized below, a two-page concise

statement of the material terms of the DIP Loan (as defined herein) is included as **Exhibit B**

pursuant to Bankruptcy Rule 4001(c)(1)(B).

2.     Newton is a nationwide distributor of customer customized promotional products,

such as writing instruments, golf balls, apparel, and travel bags.  Newton was originally founded

in 1909.  In 1988, Newton converted to an ESOP with 60% of the stock held by the ESOP and

the remaining 40% owned by twelve individuals.

3.     In 2000, Newton had 167 employees, its independent third party sales force was

composed of 700 individuals, and had annual sales of $83 million.

4.     For the twelve months ended March 31, 2015, sales declined to $26.2 million, it

incurred an unaudited net loss of approximately $2.0 million, and the employee and active third

party sales force declined to approximately 59 and 400 individuals, respectively.  The remaining

employees are vital to the Debtor's successful operation based on the critical nature of the

employees' roles and responsibilities.   The Debtor must retain the employees in order to

successfully manage and operate, and to maintain customer satisfaction.

5.     The decline in Debtor's business was caused by a dramatic increase in the number

of competitors due to low barriers to entry, a changing customer base, and a disruption in the

market place caused by the increasing influence of the internet.  A poorly executed MRP software system conversion that began in August, 2014, masked the recent severe liquidity shortfall caused by the significant loss in its fiscal year ended March, 2015, until late April 2015, made an internal restructure of the business impossible, and precipitated the bankruptcy filing to preserve the value of the business during the proposed sale process.

6.      In April, 2015, the Debtor retained Development Specialists, Inc. ("DSI") to assist the Debtor in strategic decision making, and to assist in the marketing and sale of certain of the Debtor's assets.  While operations have improved, the turn-around has taken more time than originally anticipated.  Moreover, sales have been slower to materialize than anticipated, resulting in additional operational losses.  Despite these efforts, the Debtor's cash position has continued to erode, and the filing of a voluntary petition became necessary to preserve the value of the Debtor's business.

7.      HALO Branded Solutions, Inc. ("HALO"), a Delaware corporation, Debtor's primary lender, is a leading distributor of promotional products.  It has over 700 account executives in nearly 50 states selling corporate branding solutions and products.

8.      As a part of the Debtor's lead-up to Chapter 11, it engaged in extensive negotiation with its primary lender, HALO, to secure continuity of support for the Debtor's business that includes, among other things, an agreement to provide debtor-in-possession financing on the terms and conditions of this Motion.

**INTRODUCTION**

9.      On May 31, 2015 (the "Petition Date"), the Debtor commenced this Chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Iowa (the "Court").

10.     Pursuant to Bankruptcy Code Sections 1107 and 1108, since the Petition Date, the Debtor has continued in possession of its property and operation of its business as a debtor-in-possession.  No motion for the appointment of a Chapter 11 trustee has been filed in this Chapter 11 Case.

11.     No committee of unsecured creditors has been formed and the Debtor continues to operate as a debtor-in-possession.

12.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and § 157 and over the Chapter 11 Case and the persons and property affected hereby.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (D), (K), (M) and (O).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(a), (b), (c) and (d) and 6003.

## CONCISE STATEMENT OF MATERIAL PROVISIONS
## PURSUANT TO BANKRUPTCY RULE 4001(b)(1)(B) AND (c)(1)(B)

13.     Before the Petition Date, Community Bank of Indianola ("Community Bank") provided the Debtor with an Operating Line of Credit ("Operating Line Loan") in the amount of $1,477,000, and a $370,000 Mortgage Loan secured by a warehouse owned by Newton.  The Operating Line Loan was made pursuant to the terms and conditions of the Prepetition Loan Documents (as defined below).  Immediately prior to the Petition Date, Community Bank duly assigned its rights and interests in the Operating Line Loan only (and not the Mortgage Loan), as

evidenced by the Prepetition Loan Documents only to HALO.  As of the Petition Date, (i) the

Debtor was liable to HALO, as the assignee of Community Bank, in the approximate amount of

$1,447,000, (ii) and pursuant to the Prepetition Loan Documents, the Debtor is liable to HALO

for accrued and unpaid interest in addition to all applicable fees, costs, and expenses to the extent

allowed under the Prepetition Loan Documents and applicable law, including, but not limited to

attorneys' fees and expenses.  To the extent permitted under § 506(b) of the Bankruptcy Code,

HALO is also entitled to interest accrued after commencement of the Chapter 11 Case and the

reasonable fees, costs and charges referred to in § 506(b).

14.    The Prepetition Obligations (as defined below) are evidenced and secured by,

among other things, (i) the Prepetition Credit Agreement (defined below), (ii) the Security

Agreement (as defined below), and (iii) the other Prepetition Loan Documents (defined below),

which, among other things, grant to HALO a lien and security interest in substantially all of the

Debtor's assets.

15.    Pursuant to Bankruptcy Code Section 552(b) and the Prepetition Loan Documents

(defined below), the Prepetition Obligations (defined below) are secured by a security interest

and lien in the Prepetition Collateral (defined below).

16.    HALO has agreed, at the request of the Debtor, to the entry of the Interim

Financing Order, attached as **Exhibit A**, (and if approved, the Final Financing Order) to allow

the Debtor to use Cash Collateral[1], and to extend the Debtor post-petition financing in order to

operate, obtain additional working capital to fund any cash shortfalls, and to refinance the

existing Prepetition Obligations (defined below).  Specifically, the Debtor is seeking, and HALO

(in its capacity as post-petition lender, the "DIP Lender") has agreed, pursuant to the terms of the

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Interim Financing
Order.

Interim Financing Order, the DIP Loan Agreement (defined below), to provide post-petition financing in the approximate maximum amount of $553,000.   The post-petition non-default interest rate is 8.5% fixed annual percentage rate.

17.     As indicated above, the first $205,000 of post-petition funding under the DIP Loan (defined below) is conditioned upon the entry of the Interim Financing Order.   The remainder of the funding under the DIP Loan (defined below) including the $348,000 and any repayment of the Prepetition Obligations (defined below) is conditioned upon the final approval of the instant Motion pursuant to Bankruptcy Rule 4001.

18.     For the avoidance of doubt, the purpose of the DIP Loan (defined below) is to: (a) provide revolving credit for business operations; (b) advance up to $553,000 in additional working capital pursuant to the budget, attached as Exhibit B to the Interim Financing Order (the "Budget"); and (c) refinance the existing term indebtedness owing to HALO.

19.     Pursuant to Bankruptcy Rule 4001(c)(1)(B), and as more fully detailed in **Exhibit B** hereto, the following are material provisions the Debtor wishes to highlight for the Court:[2]

- The DIP facility includes an extension of credit of $553,000.
- The DIP facility is secured by a first-priority lien and security interest that secures all obligations owing to HALO.
- Valid, existing pre-petition liens by other creditors—Permitted Encumbrances—continue in their pre-petition order of priority.
- Shortfalls or diminution of value, if any, are granted a super-priority administrative claim.

---

[2] The summaries and descriptions of the terms and conditions of the Interim Financing Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and parties should refer directly to the Interim Financing Order for complete details with respect to the relief provided therein.  The summaries and descriptions are qualified in their entirety by the Interim Financing Order.  In the event there is any conflict between this Motion and the Interim Financing Order, the Interim Financing Order shall control in all respects.

- The DIP contemplates a "roll-up" of the HALO Prepetition Obligations (defined below) after entry of the Final Financing Order.

- HALO will receive a release of claims effective upon the entry of the Final Financing Order. A committee reserves challenge rights as to HALO's claims and liens for 30 days.

- To the full extent permitted by applicable law, a waiver of Section 506(c) surcharge rights.

- Although there are no origination fees, unused line fees or other traditional banking fees, HALO shall be entitled to recover its reasonable attorneys' fees and costs incurred in connection with this Motion.

- The DIP Loan (defined below) contains a modified "drop-dead" stay relief provision that permits the Debtor to obtain an expedited hearing to challenge a default giving rise to stay relief.

## **DEBTOR'S EXERCISE OF BUSINESS JUDGMENT FOR DIP LOAN**

21.    The Debtor has exercised its valid business judgment in seeking approval of the instant Motion for the reasons set forth below.

22.    Based upon the Debtor's budget, the Debtor has an immediate need to use Cash Collateral to operate its business and otherwise continue as a going concern. The three largest expense items in the Debtor's budget are for the purchase of inventory for sale, payroll and sales commissions to the debtor's independent sales representatives, and the Debtor's single largest vendor is BIC Pens. The Debtor projects that it will have cash shortfalls post-petition without the influx of new working capital.

23.    HALO's continued support of the Debtor is absolutely essential for the Debtor to continue as a going-concern, and to maintain value pending a sale of the Debtor's assets. Given the Debtor's current cash flow, the Debtor cannot continue to operate and do business and will not continue as a going concern without additional ongoing credit support from HALO.

24.     Given the critical nature of the support and involvement of HALO to the continued existence of the Debtor and the preservation of the value of the Debtor's estate, the Debtor believes that the relief requested in the Motion, including (subject to the entry of a Final Financing Order) the repayment of the pre-petition secured debt of HALO from a portion of the DIP Loan, is reasonable under the circumstances for the following reasons:

- HALO is providing ongoing revolving credit on the Open Account for the purchase of necessary inventory;

- HALO is providing up to **$553,000 in new post-petition funds** for the working capital needs of the Debtor, subject to the Budget, thereby increasing HALO's credit exposure by an amount greater than the Prepetition Obligations (defined below);

- HALO is agreeing to allow the Debtor to benefit from certain unmatured obligations to meet current financial needs; and

- HALO is providing a stalking horse bid which will provide a floor for the purchase of the Debtor's assets pursuant to a sale under Section 363 of the Bankruptcy Code.[3]

## **RELIEF REQUESTED**

25.     By this Motion, the Debtor seeks the entry of the Interim Financing Order and Final Financing Order:

a)  Authorizing the Debtor to obtain secured post-petition financing on a super-priority basis (the "DIP Loan") subject only to the Permitted Encumbrances (as defined in the Loan Agreement (defined herein));

---

[3]  Although the Debtor is filing contemporaneously herewith a motion to approve bid procedures and for a sale of substantially all of its assets, neither the HALO stalking horse bid, nor bid procedures are scheduled as a first-day matter and are being set on normal notice.

b) Authorizing the Debtor to execute and enter into the DIP Loan Agreement (attached as Exhibit A to the Interim Financing Order) (the "DIP Loan Agreement") between the Debtor and HALO (a copy of which has been filed with the Court), and to perform such other and further acts as may be required in connection with the DIP Loan Agreement and the DIP Loan Documents (as defined in the DIP Loan Agreement) and approving the DIP Loan Documents;

c) Granting super-priority administrative expense claims to HALO for the post-petition financing payable from, and having recourse to all of the pre-petition and post-petition property of the Debtor's estate and all proceeds thereof subject only to the Carve-Out (defined below) and the Permitted Encumbrances, and granting liens for the post-petition financing to HALO in all Post-Petition Collateral (defined below) in accordance with the DIP Loan Agreement, the DIP Loan Documents and this Interim Financing Order;

d) Authorizing the Debtor to use Cash Collateral of DIP Lender in accordance with the terms and conditions set forth in the DIP Loan and the Interim Financing Order;

e) Granting of adequate protection to DIP Lender of its interests in the Collateral, pursuant to Code §§ 361, 363(e) and 364(d); and

f) Scheduling a final hearing (the "Final Hearing") to consider entry of a final order authorizing, among other things, the Debtor to obtain financing under the DIP Loan, and the DIP Loan Agreement and approving the terms and conditions of the DIP Loan, the DIP Credit Agreement, and the Final Financing Order..

26.    *Opportunity to Object*.  Pursuant to Bankruptcy Rule 4001(d)(2), any objection to the entry of the Final Financing Order must be filed on or before June 21, 2015 (the "Objection Date").  A final hearing (the "Final Hearing") on the Motion shall take place on **June 22, 2015, at [    :    ] [ ].m.**, before the Honorable [_____], United States Bankruptcy Judge for the Southern District of Iowa, at 110 East Court Avenue, Des Moines, Iowa 50309.

27.    *Form of Objections*.  Objections must be in writing and be filed with the Clerk of the Court so that any such objections are received on or before the Objection Date.  Copies of any objection shall be served upon counsel for the following:  (a) the Debtor, Bradshaw, Fowler,

Proctor & Fairgrave, P.C., 801 Grand Avenue, Suite 3700, Des Moines, Iowa 50309, Attn:

Jeffrey D. Goetz; (b) the DIP Lender, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago,

Illinois 60654, Attn: Ryan B. Bennett and Alexandra Schwarzman; and Cutler Law Firm, 1307

50th Street, West Des Moines, Iowa 50266, Attn: Robert C. Gainer.

28.     *DIP Lender's Good Faith*.  The Debtor and the DIP Lender have demonstrated to

the Court that they have negotiated at arm's length, that the DIP Lender has acted in good faith

in the negotiation and preparation of the Interim Financing Order and Final Financing Order, and

that both parties have been represented by counsel and intend to be and are bound by the terms of

the DIP Loan Documents and the Interim Financing Order and Final Financing order.  The terms

of the Interim Financing Order and Final Financing Order reflect the Debtor's exercise of

prudent business judgment under exigent circumstances, are consistent with their fiduciary duties

and are supported by reasonably equivalent value and fair consideration.

29.     *Notice*.  Notice of this Motion and the interim hearing with respect thereto will be

given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, and

9006 and as required by sections 102, 105, 361, 362, 363 and 364 of the Bankruptcy Code.

Other than the notice provided for herein, no further notice of the relief sought in the Motion is

necessary.

30.     *Debtor's Stipulations*.  Subject to the rights of any non-Debtor party-in-interest,

other than the Prepetition Lender, to, among other things, challenge the validity, priority,

perfection, and enforceability of the Prepetition Obligations (defined below) and the Prepetition

Liens (defined below), the Debtor admits, stipulates, and agrees that:

10

(a)      Pursuant to that certain Credit and Guaranty Agreement dated as of April 14, 2014, (the "Prepetition Credit Agreement," and together with all other agreements, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Loan Documents") by and among Newton (the "Borrower"), HALO as assignee of Community Bank, as lender (the "Prepetition Lender"), the Prepetition Lender made loans, issued letters of credit and provided other financial accommodations to or for the benefit of the Debtor.

(b)      As of the Petition Date, pursuant to the Prepetition Loan Documents, the Borrower was indebted to the Prepetition Lender in the amount of $1,447,000 with respect to the aggregate principal amount of debt, but exclusive of interest, fees and other reasonable expenses.

(c)      For purposes of this Motion, the term "Prepetition Obligations" shall mean and include, without duplication, any and all amounts owing or outstanding under the Prepetition Loan Documents (including, without limitation all obligations), and all interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable under the applicable provisions of the Prepetition Loan Documents).

(d)      Pursuant to the Prepetition Loan Documents, the Debtor granted to the Prepetition Lender liens and security interests (the "Prepetition Liens") on and in substantially all of the Debtor's property and assets whether real or personal, tangible or intangible, and wherever located, and whether now or hereafter existing or acquired, and all the proceeds,

products, offspring, rents and profits thereof (the "Prepetition Collateral") to secure the Prepetition Obligations and guaranties thereof;

(e)     As of the Petition Date and immediately prior to giving effect to the Order to be entered herein, but subject to the rights of any non-Debtor party-in-interest (other than the Prepetition Lender) to, among other things, challenge the validity, priority, perfection, and enforceability of the Prepetition Obligations and the Prepetition Liens:

i.     The Prepetition Loan Documents are legal, valid, and binding agreements and obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay enforcement arising from section 362 of the Bankruptcy Code);

ii.     The Prepetition Liens (A) constitute valid, binding, enforceable and properly perfected first priority interests and liens that, prior to the entry of the Order on this Motion, were subject only to the Permitted Liens (as defined in the Prepetition Credit Agreement) and (B) are not subject to objection, avoidance, reduction, disallowance, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity;

iii.     The aggregate value of collateral securing the liens and claims with respect to the Prepetition Loan Documents exceeds the amount of the claims owing under such documents;

iv.  The Prepetition Obligations constitute the legal, valid, and binding obligations of the Debtor as set forth in the Prepetition Loan Documents, enforceable in accordance with their terms (other than in respect of the stay enforcement arising from section 362 of the Bankruptcy Code).  The Prepetition Obligations are not subject to (A) any objection, offset, defense, counterclaim, or "claim" (as such term is defined in the Bankruptcy Code) of any kind or nature, or (B) avoidance, reduction, disallowance, recharacterization, or subordination (whether equitable, contractual, or otherwise) pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity; and

v.  No claims, objections, challenges, counterclaims, causes of action and/or choses in action, defenses, or setoff rights of any Debtor exist against the Prepetition Lender and the Prepetition Obligations and Prepetition Liens under any contract or tort (including, without limitation, lender liability) theories of recovery, whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 (including, without limitations, sections 510, 544, 547, 548, 549, or 550) of the Bankruptcy Code, or under any other similar provisions of applicable state or federal law, and to the extent any claims, objections, challenges, counterclaims causes of action and/or choses in action, defense, or setoff rights are deemed to have existed as to any of the foregoing, the Debtor hereby waives, discharges, and releases any right they may have to challenge any of the Prepetition Obligations and the Prepetition

Liens, and to assert any offsets, defenses, claims, objections, challenges, counterclaims, causes of action and/or choses of action against the Prepetition Lender.

31.     *The Cash Collateral*.  All cash and cash equivalents of the Debtor, whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition Lender or the DIP Lender, constitute cash collateral, as contemplated by section 363 of the Bankruptcy Code ("Cash Collateral").

32.     *Payments to the Prepetition Lender as Adequate Protection*.  Without prejudice to the rights of any party, the Court should find that the Prepetition Lender has interests in the accounts receivable generated before the Petition Date and, thus, such accounts receivable and its proceeds constitute Cash Collateral as contemplated in section 363 of the Bankruptcy Code.  The Debtor is hereby authorized to use Cash Collateral to the extent set forth in the Budget, which includes but is not limited (i) to making payments to the Prepetition Lender, which the Prepetition Lender shall apply to reduce the principal and interest due to the Prepetition Lender as of the Petition Date, (ii) paying the DIP Lender a fee equal to $40,000 upon the effectiveness of the Change of Terms Agreement and (iii) reimbursing the DIP Lender for all its reasonable costs and expenses in accordance with the DIP Loan Documents; *provided*, however, that such payments described in clause (i) shall be subject to disgorgement if the security interests of the Prepetition Lender are successfully avoided.  The Court should find that such use of Cash Collateral adequately protects the Prepetition Lender's interests, and that no further adequate protection is required by the Debtor under the circumstances.  The Debtor has requested immediate entry of an Order on this Motion pursuant to Bankruptcy Rule 4001(b)(2).  The permission granted herein to use the Cash Collateral is necessary to avoid immediate and

irreparable harm to the Debtor.  Based upon the foregoing findings and conclusions, and upon

the record to be made before this Court at the Interim Hearing, and good and sufficient cause

appearing therefore, this Court should conclude that entry of an Order on this Motion is in the

best interest of the Debtor's estate and creditors.

33.     *Prepetition Lender's Adequate Protection*.  The Prepetition Lender is entitled,

pursuant to section 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of

its interests in the Prepetition Collateral, including the Cash Collateral, for any diminution in the

value of such interests on account of, among other things, the priming of the Prepetition Lender's

interests in the Prepetition Collateral in respect of the Carve Out and the DIP Obligations, and

the Debtor's use of Prepetition Collateral (each, a "Diminution Claim").  As security for and

solely to the extent of any Diminution Claim, the Prepetition Lender should be granted, *nunc pro*

*tunc* to the Petition Date, the following adequate protection (collectively, the "Adequate

Protection Provisions"):

(a)     Adequate Protection Liens.  The Prepetition Lender should be granted

valid and perfected postpetition replacement security interests in and liens upon the Collateral

(the "Adequate Protection Liens"), which liens shall be subject and subordinate to (i) the Carve

Out and (ii) the DIP Liens and any liens on the Collateral that are senior to, or *pari passu* with,

the DIP Liens.

(b)     Section 507(b) Claim.  The Prepetition Lender should be granted, subject

and subordinate to the payment of the Carve Out and DIP Claims, a Superpriority Claim.

(c)     Fees and Expenses.  Without further application to this Court, the Debtor

should be authorized and directed to pay on an ongoing basis, from time to time after the

Petition Date, and without duplication, pursuant to the procedures set forth in this paragraph 10,

all reasonable and documented fees and expenses incurred by the Prepetition Lender (acting in such capacity) during and in connection with these Cases and required to be paid by the Debtor under the Prepetition Credit Agreement, and the reasonable and documented fees and expenses of (i) Kirkland & Ellis LLP, counsel to the Prepetition Lender, and (ii) Cutler Law Firm, co-counsel to the Prepetition Lender (collectively, the "Prepetition Professional Fees and Expenses").  The Debtor shall pay the Prepetition Professional Fees and Expenses within ten (10) Business Days (if no written objection is received with such ten (10) Business Days' period) after such professional has delivered an invoice to the Debtor describing such fees and expenses (but in any event providing reasonable detail with respect to the fees and expenses incurred), with a copy of such invoices delivered simultaneously to the DIP Lender, the U.S. Trustee, and counsel to the Committee, if any; *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential, or proprietary information.  Parties in interest may deliver written objections to payment of the Prepetition Professional Fees and Expenses within ten (10) Business Days following receipt of an invoice for Prepetition Professional Fees and Expenses.  None of the Prepetition Professional Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided*, *however*, if an objection to a professional's invoice is timely received, the Debtor shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

      34.    *Findings Concerning DIP Financing*.  The Debtor requires financing to continue its operations and to preserve the value of its pre-petition assets, including the Cash Collateral.

The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lender pursuant to, and for the purposes set forth in, the DIP Loan Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit allowable as a general unsecured claim, as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or otherwise without granting priming liens to the DIP Lender under Sections 364(c)(2) and (d)(1) of the Bankruptcy Code and the Superpriority Claims (as defined herein) under section 364(c)(1) of the Bankruptcy Code, on the terms and conditions set forth in this Order and the DIP Loan Documents.  The Court should find as follows concerning the DIP Loan Documents:

(a)    The terms of the use of the DIP Loan Documents and the Collateral described therein, including the Cash Collateral, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

(b)    The DIP Loan Documents and the use of the Collateral, including the Cash Collateral, have been the subject of good faith negotiations conducted at arm's length among the Debtor and the DIP Lender and all of the obligations and indebtedness arising under or in connection with the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Lender in "good faith" as such term is used in Sections 363(m) and 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that any Order on this Motion or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(c)     Absent the relief set forth in the Order on this Motion, the Debtor and its business operations will be immediately and irreparably harmed.  In particular, the Debtor requires immediate postpetition financing, and continued use of the Collateral, including the Cash Collateral, in order to, among other things, maintain the value of their assets, pay payroll and employee benefit expenses, and preserve the value of the Debtor's estate for the benefit of its creditors and stakeholders.  The borrowing under the terms of the DIP Loan Documents and the use of the Collateral, including the Cash Collateral, in accordance with the Order on this Motion and the DIP Agreement are, therefore, in the best interest of the Debtor.

35.     *Approval of DIP Loan Documents*.  The Court should approve the DIP Loan Documents, on an interim basis as set forth herein, and authorize the Debtor and any of its subsidiaries to execute, deliver, and perform their respective obligations under the DIP Loan Documents.  The Debtor should be authorized to borrow and be jointly and severally obligated under the DIP Loan Documents in an aggregate principal amount not to exceed Two Hundred and Five Thousand Dollars ($205,000) (the "Interim Advance") on an interim basis and, subject to the Final Order, Five Hundred and Thirty Five Thousand Dollars ($553,000), for operational and working capital purposes of the Debtor, interest and fees under the DIP Loan Documents, and the allowed costs and expenses of its Case (including the Carve Out as defined below), in each case (other than the fees and expenses of the DIP Lender reimbursable pursuant to the terms of the DIP Loan Documents), solely in accordance with the interim Budget (a copy of which is attached hereto as **Exhibit C**).  The Interim Advance is hereby approved and shall be made available to the Debtor upon effectiveness of the DIP Loan Documents and otherwise in accordance with the Budget without further request from the Debtor; provided, that such Interim Advance shall be made weekly in accordance with the Budget.  In furtherance of the foregoing

and without further approval of this Court on this Motion, the Debtor should be authorized and directed to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified), including without limitation:

      (a)     The execution, delivery and performance of the DIP Loan Documents;

      (b)     Performing and incurring Adequate Protection Obligations as provided for in the Order on this Motion and the DIP Loan Documents; and

      (c)     The performance of all other acts required under or in connection with the Order on this Motion and the DIP Loan Documents.

The DIP Loan Documents and the obligations thereunder constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of the Order on this Motion and the DIP Loan Documents.  No obligation, payment, transfer, or grant of security by the Debtor under the DIP Loan Documents or the Order on this Motion shall be voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including, without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

      36.    *Budget*. Attached hereto as **Exhibit C** and incorporated by reference herein is the four-week budget (which has been approved by the DIP Lender) setting forth the Debtor's projected loan advances, receipts and disbursements for such period (the "Initial Approved Budget").

      (a)     The Debtor's use of Cash Collateral shall be consistent with the types of expenses set forth in the Initial Approved Budget and subject to the requirements set forth in the

DIP Loan Documents and in accordance with the permitted variances and other terms contained in the Order on this Motion and the DIP Loan Documents.  The DIP Lender shall have no obligation with respect to the Debtor's use of the Cash Collateral, and shall not be obligated to ensure or monitor the Debtor's compliance with the Initial Approved Budget or to pay (directly or indirectly from the Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Initial Approved Budget.  Any and all Cash Collateral shall be used by the Debtor in accordance with the Order on this Motion, the Initial Approved Budget, and the DIP Loan Documents.  Except with respect to the Carve Out, the DIP Lender's consent to the Initial Approved Budget shall not be construed as consent to the use of any Cash Collateral after the occurrence of an Event of Default (as defined below), regardless of whether the aggregate funds shown on the Initial Approved Budget have been expended.

(b)    Notwithstanding anything to the contrary contained herein, and (i) prior to the closing of that certain Asset Purchase Agreement among the Debtor and HALO dated as of May 28, 2015, (the "Agreement") and (ii) so long as the Agreement has not been terminated pursuant to its terms, no payment shall be made using Cash Collateral or the proceeds of the DIP Facility to any Debtor's Professional (as defined below) to the extent that it would cause the aggregate amount paid to such Debtor's Professionals to exceed the aggregate amount of fees and expenses set forth in the Budget with respect to such Debtor's Professionals, it being understood that amounts unpaid as a result of the preceding limitation may be accrued and, subject to the Order on this Motion, paid (x) in connection with the Carve Out, (y) in any subsequent period to the extent that actual fees and expenses incurred in such subsequent period are less than the fees and expenses in the Budget for such subsequent period, or (z) pursuant to the terms of a plan of liquidation or with cash that is not Cash Collateral; *provided*, however,

that nothing in the Order on this Motion shall limit any Debtor's Professional's right to request, or the Court's power to authorize, the allowance of fees and expenses pursuant to Sections 330 and 331 of the Bankruptcy Code.

37.     *Budget Compliance.*  The Debtor will not permit:

(a)     The aggregate amount of the actual receipts during each calendar week, commencing with the calendar week ending June 5, 2015, to be less than 85% of the budgeted amount, on a cumulative basis, set forth in the Initial Approved Budget; or

(b)     The aggregate amount of the actual disbursements of the type set forth in each of the following line items: during any calendar week, commencing with the calendar week ending June 5, 2015, to be more than 110% of the budgeted amount, on a cumulative basis, in each case, set forth in such line items in the Initial Approved Budget.

38.     *Carve Out.*

(a)     As used in the Interim Order on this Motion, the "Carve Out" means the sum of the following:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) any and all accrued and unpaid fees, disbursements, costs, and expenses (the "Debtor's Professional Fees") incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor's Professional Persons") and any and all accrued and unpaid fees, disbursements, costs, and expenses (the "Committee's Professional Fees," and together with the Debtor's Professional Fees, the "Professional Fees") incurred by persons or firms retained by any

statutory committee of unsecured creditors, if any (the "<u>Committee</u>") pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Committee's Professional Persons</u>," and together with the Debtor's Professional Persons, the "<u>Professional Persons</u>") at any time before or on the day of delivery of a Carve Out Trigger Notice (as defined below) that remain unpaid after application of any retainers and solely to the extent allowed by the Bankruptcy Court (whether by interim order, procedural order, or otherwise prior to or after delivery of a Carve Out Trigger Notice) (the "<u>Pre-Trigger Notice Professional Fees</u>"); and (iv) Professional Fees of Debtor's Professional Persons in an aggregate amount not to exceed $100,000 and of the Committee's Professional persons in an aggregate amount not to exceed $50,000,  incurred after the day of delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the Interim Order on this Motion, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email by the DIP Lender to the Debtor, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.\

      (b)     On the day on which a Carve Out Trigger Notice is delivered to the Debtor, the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtor for loans under the DIP Facility in an amount equal to the then unpaid amounts of the Pre-Trigger Notice Professional Fees <u>plus</u> the Post-Carve Out Trigger Notice Cap <u>minus</u> the amount of any unused retainers of Professional Persons and <u>minus</u> the full amount of the Debtor cash on hand as of such date (*provided*, that the Debtor shall notify the DIP Lender of the amount deemed requested as promptly as possible following delivery of the

Carve Out Trigger Notice and in no event later than the following day; and, *provided*, *further*, that the DIP Lender shall not be required to fund the borrowing deemed requested pursuant hereto until the Debtor have notified the DIP Lender of such amount), and (ii) also constitute a demand to the Debtor to utilize all cash on hand as of such date to fund such reserve (the "Carve Out Reserves"); for the avoidance of doubt, in no event shall the aggregate amount deemed request under the DIP Facility pursuant to clause (i) exceed the then unpaid amounts of the Pre-Trigger Notice Professional Fees plus the Post-Carve Out Trigger Notice Cap minus the amount of any unused retainers of Professional Persons.  In full satisfaction of the Carve Out, the Debtor shall deposit and hold the Carve Out Reserves in a segregated account in trust to pay such then unpaid Pre-Trigger Notice Professional Fees prior to any and all other claims, and thereafter to pay Professional Fees incurred after the day of delivery of the Carve Out Trigger Notice and allowed by an appropriate order of this Court up to the amount of the Post-Carve Out Trigger Notice Cap prior to any and all other claims.  On the first business day following delivery of the Carve Out Trigger Notice, notwithstanding the existence of a default or Event of Default or the failure of the Debtor to satisfy any or all of the conditions precedent for loans under the DIP Facility, the DIP Lender shall make available to the Debtor the amounts described in clause (i) of the first sentence of this paragraph in accordance with the terms hereof and of the DIP Facility; *provided*, for the avoidance of doubt, that the DIP Lender shall not be required to fund any such borrowing to the extent that the aggregate principal amount of the DIP Loan would, after giving effect to such borrowing, exceed the Maximum Loan Balance (as defined in the DIP Credit Agreement).  Notwithstanding anything to the contrary in the DIP Documents or the Interim Order on this Motion, following delivery of a Carve Out Trigger Notice, the DIP Lenders and the Prepetition Lender shall not sweep or foreclose on cash (including cash

received as a result of the sale or other disposition of any assets) of the Debtor until the Carve

Out Reserves have been funded in accordance with the first sentence of this paragraph, and shall

have a security interest in any surplus amounts remaining in the Carve Out Reserves after

payment of allowed Professional Fees (whether or not out of the Carve Out Reserves) up to the

amount of the Carve Out.  Further, notwithstanding anything to the contrary herein (including

the fact that no funds shall be disbursed from the Carve Out Reserves to pay Professional Fees

until approved by the Bankruptcy Court), (i) the Professional Persons shall return to the Carve

Out Reserves any amounts they receive from the Carve Out Reserves for Professional Fees that

are not allowed by the Bankruptcy Court (whether by interim order, procedural order, or

otherwise prior to or after delivery of a Carve Out Trigger Notice) or are otherwise required by

the Bankruptcy Court to be disgorged or returned, and (ii) any surplus amounts remaining in the

Carve Out Reserves after payment of allowed Professional Fees up to the amount of the Carve

Out (whether or not paid out of the Carve Out Reserves) shall be paid to the DIP Lender.

(c)  The DIP Lender shall not be responsible for the payment or reimbursement of

any fees or disbursements of any Professional Person incurred in connection with this Case or

any successor cases under any chapter of the Bankruptcy Code.  Nothing in the Interim Order

on this Motion or otherwise shall be construed to obligate the DIP Lender in any way to pay

compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the

Debtor has sufficient funds to pay such compensation or reimbursement.

(d)  Any payment or reimbursement made prior to the occurrence of the Carve

Out Trigger Notice in respect of any Debtor's Professional Fees shall not reduce the Carve Out.

(e)  Any payment or reimbursement made on or after the occurrence of the Carve

Out Trigger Notice in respect of any Professional Fees (whether out of the Carve Out Reserves

or otherwise) shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding

of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP

Collateral and shall otherwise be entitled to the protections granted under this Interim Order, the

DIP Documents, the Bankruptcy Code, and applicable law.

     39.    *Granting of DIP Liens and Superpriority Claims*. Subject to the Carve Out in all

respects, the DIP Obligations shall be:

     (a)    Entitled to superpriority claim status under Section 364(c)(1) of the

Bankruptcy Code (the "<u>Superpriority Claim</u>") with priority over all administrative expense

claims, secured claims, and unsecured claims now existing or hereafter arising under the

Bankruptcy Code. The superpriority claims of the DIP Lender may be repaid from any cash of

the Debtor, including without limitation, Cash Collateral;

     (b)  Secured, pursuant to Section 364(c)(2) and (d)(1) of the Bankruptcy Code, by

valid, enforceable first priority, fully perfected security interests in and liens (herein, the "<u>DIP</u>

<u>Liens</u>") upon all of the Debtor's rights all pre- and postpetition property of the Debtor

(including, without limitation, Cash Collateral, inventory, accounts receivable, other rights to

payment whether arising before or after the Petition Date, contracts, properties, plants,

equipment, general intangibles, documents, instruments, interests in leaseholds, real properties,

patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and

the proceeds of all of the foregoing), whether now existing or hereafter acquired, that is subject

to any existing lien presently securing Prepetition Obligations (including in respect of issued but

undrawn letters of credit (collectively, the "<u>DIP Collateral</u>");

     (c)  The DIP Collateral shall also include any and all rents, issues, products,

offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of

any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

40.     *Liens Senior to Certain Other Liens*. The DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date; or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

41.     *Remedies After an Event of Default*. Notwithstanding anything to the contrary in the DIP Loan Documents, the automatic stay under Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender: (i) to exercise its rights to make demands under the DIP Loan Documents, including without limitation under Section 3(a) of the DIP Loan Documents; and (ii) immediately upon the occurrence and during the continuance of an Event of Default (as defined below), to accelerate the DIP Obligations as provided for in the DIP Loan Documents and, thereafter, take all or any of the actions set forth in the DIP Loan Documents, including without limitation the following actions, without further order of or application to the Bankruptcy Court, provided that, in the case of the enforcement of liens or other remedies with respect to collateral pursuant to clause (b) below, the DIP Lender shall provide the Debtor (with a copy to any counsel for the Committee, appointed in the Cases and to the United States Trustee) with five (5) business days' prior written notice during which time any such party must file a pleading seeking an emergency hearing in opposition to the DIP Lender's exercise of its rights and remedies and provided further, that in any hearing following such notice, the only issue that may be raised by the Debtor in opposition to the actions

proposed or available to be taken by the DIP Lender shall be whether, in fact, an Event of Default has occurred and is continuing:

(a)      Immediately cease extending any further advances or loans under the DIP Loan Documents;

(b)      Declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable and terminate, as applicable, any further commitments under the DIP Loan Documents and/or terminate the right of the Debtor to use Cash Collateral;

(c)      Enforce the DIP Lender's liens or pursue other remedies with respect to collateral as the DIP Lender may deem appropriate or necessary; and

(d)      Charge the default rate of interest (18% per annum commencing September 1, 2015) under the DIP Loan Documents and take any other action or exercise any other right or remedy (including without limitation, with respect to the liens in favor of the DIP Lender) permitted under applicable law.

42.      *Limitations on Charging Expenses Against Collateral.*  Except to the extent of the Carve Out and subject to entry of the Final Order on this Motion, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral securing the DIP Loans pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

43. *Limitations under Section 552(b) of the Bankruptcy Code.* The DIP Lender shall

be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and no

expenses of administration of the Case or any future proceeding that may result therefrom,

including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be

charged against proceeds, product, offspring, or profits from any of the collateral under section

552(b) of the Bankruptcy Code.

44. *Payments Free and Clear.* Any and all payments or proceeds remitted to the DIP

Lender pursuant to the provisions of the Order on this Motion or any subsequent order of this

Court shall be received free and clear of any claim, charge, assessment or other liability.

45. *Reporting Requirements.* Debtor shall comply with the following reporting

requirements:

(a) Debtor shall deliver such reports, as and when due, pursuant to the terms

of the DIP Loan Documents;

(b) Debtor shall provide copies of all monthly reports, projections, or other

information respecting the Debtor's business or financial condition as well as all pleadings,

motions, applications, and judicial information filed in respect thereof by or on behalf of the

Debtor, in each case, with the Bankruptcy Court or provided by or to the U.S. Trustee (or any

monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the

time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee

(or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee

(c) On or before 6:00 p.m. on the third Business Day of each week (with the

first such delivery date being Wednesday, June 10, 2015), Debtor shall provide (i) a budget

variance report, together with a certificate substantially in the form agreed between Debtor and

the DIP Lender, from an officer as to the compliance with the requirements under paragraph 14

herein and (ii) a borrowing base certificate, substantially in the form agreed between Debtor and

DIP Lender, from an officer of Debtor demonstrating that the obligations outstanding under the

DIP Loan Documents as of the last day of the preceding week do not exceed the lesser of the

commitment and the borrowing base (as defined therein).

(d)     From time to time, such other information regarding the business,

operation and financial condition of any Debtor as DIP Lender may reasonably request.

(e)     Debtor shall provide at the close of each business day:  (i) a roll forward

of the Debtor's budget and (ii) a daily bookings report.

46.     *On-Site Diligence Requirements*.  The Debtor shall permit the DIP Lender and its

representatives (including its legal counsel, accountants, advisors, financing sources, and agents)

to have full access, upon reasonable notice and during normal business hours throughout the

period prior to the closing of any sale of all or substantially all of the Debtor's assets, to (a) the

properties, books and records (including tax returns), premises, contracts, and documents of the

Debtor, including all financial and operating data and other information concerning the Debtor's

business and/or the Debtor, as the DIP Lender may reasonably request, and (b) officers and

employees of the Debtor.  The Debtor shall use its commercially reasonable efforts to maximize

the amount of information to which it provides the DIP Lender access, whether by obtaining

consent of third parties, entering into confidentiality agreements, or otherwise.

47.     *Perfection of the DIP Liens and Adequate Protection Liens*.

(a)     The DIP Lender and its agents are hereby authorized, but not required, to

file or record financing statements, intellectual property filings, mortgages, notices of lien or

similar instruments in any jurisdiction, take possession of or control over, or take any other

action in order to validate and perfect the DIP Liens and the Adequate Protection Liens granted

to them under the Order on this Motion. Whether or not the DIP Lender or its agents shall, in

their respective sole discretion, choose to file such financing statements, intellectual property

filings, mortgages, notices of lien or similar instruments, take possession of or control over, or

otherwise confirm perfection of the DIP Liens and the Adequate Protection Liens, such DIP

Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable,

non-avoidable and not subject to challenge, dispute or subordination as of the date of the Order

on this Motion.

(b)      A certified copy of the Order on this Motion may, in the discretion of the

DIP Lender and its agents, as the case may be, be filed with or recorded in filing or recording

offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or

similar instruments, and all filing offices are hereby authorized to accept such certified copy of

the Order on this Motion for filing and recording.

(c)      The Debtor shall promptly execute and deliver to the DIP Lender or its

agents all such agreements, financing statements, instruments, and other documents as the DIP

Lender may reasonably request to evidence, confirm, validate, or perfect the DIP Liens and the

Adequate Protection Liens.

48.      *Preservation of Rights Granted Under the Order on this Motion.*

(a)      No claim or lien (other than the DIP Liens) having a priority senior to or

*pari passu* with those granted by the Order on this Motion to the DIP Lender shall be granted or

allowed while any portion of the DIP Obligations and the DIP Liens and the Adequate

Protection Obligations remain outstanding, and the Adequate Protection Liens shall not be

subject or junior to any lien or security interest that is avoided and preserved for the benefit of

the Debtor's estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations, Prepetition Obligations, and Adequate Protection Obligations shall have been indefeasibly paid in full in cash or otherwise satisfied, in the case of clause (i) below, the Debtor shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use the Cash Collateral if the Debtor seeks, or if there is entered, (i) any modification of the Order on this Motion without the prior written consent of the DIP Lender, as applicable, and no such consent shall be implied by any other action, inaction, or acquiescence by the DIP Lender, or (ii) an order converting or dismissing the Case.

(c)    If any or all of the provisions of the Order on this Motion are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall, to the extent provided in sections 363(m) and 364(e) of the Bankruptcy Code, not affect (i) the validity, priority, or enforceability of any DIP Obligations, Prepetition Obligations, or the Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification, or vacatur or (ii) the validity, priority, or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of the Cash Collateral, any DIP Obligations, or any Adequate Protection Obligations incurred by the Debtor to the DIP Lender or the Prepetition Lender, as the case may be, prior to the effective date of such reversal, stay, modification, or vacatur shall, to the extent provided in sections 363(m) and 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of the Order on this Motion, and the DIP Lender and the Prepetition Lender shall be

entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the Order on this Motion, the DIP Agreement, the Prepetition Loan Documents, the Adequate Protection Obligations, and uses of the Cash Collateral.

(d)     Except as expressly provided in the Order on this Motion, the order approving the sale of all or substantially all of the assets of the Debtor (the "Sale Order"), or in the DIP Agreement, or as agreed to by the parties, the DIP Liens, the Superpriority Claim, the Adequate Protection Liens, the 507(b) Claim, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the Order on this Motion and the DIP documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of the Sale Order or the closing of such approved sale, (ii) the entry of an order converting the Case to a case under Chapter 7 of the Bankruptcy Code, dismissing the Case, or (iii) the entry of an order confirming a plan of reorganization or liquidation in the Case. The terms and provisions of the Order on this Motion and the DIP Loan Documents shall continue in the Case, or in any superseding Chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Adequate Protection Obligations, the Superpriority Claim, the Section 507(b) Claim, the other administrative claims granted pursuant to the Order on this Motion, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the Order on this Motion and the DIP documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash and all Adequate Protection Obligations are indefeasibly paid in full in cash or otherwise satisfied.

49.     *Limitation on Use of the DIP Loans, the DIP Collateral, Cash Collateral.* The Debtor shall use the DIP Loans and Collateral, including the Cash Collateral, solely as provided in the Order on this Motion, the Initial Approved Budget, and the DIP Loan Documents. Except

as expressly set forth herein, neither the DIP Loans, the DIP Collateral, the Collateral, including the Cash Collateral, nor the Carve Out may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent, or enforceability of any amount due under the DIP Loan Documents, or the liens or claims granted under the Order on this Motion or the DIP Loan Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the DIP Lender's assertion, enforcement, or realization on the Collateral or the DIP Collateral in accordance with the DIP Loan Documents or the Order on this Motion, or (d) seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Loan Documents and the Initial Approved Budget.

50.    *Events of Default*.   The occurrence and continuation of any of the following events, unless waived by the DIP Lender in its sole discretion, shall constitute an event of default (each, an "Events of Default"):

(a)    The occurrence of any "default," or "event of default" as defined in any DIP Loan Document (other than the Order on this Motion) or the breach of any of the terms or provisions of any DIP Loan Document (other than the Order on this Motion), which default or breach continues beyond any notice, grace, or cure period therein provided;

(b)    The obtaining after the Petition Date of indebtedness (including any guarantees) in an amount in excess of $10,000 in the aggregate;

33

(c)      The incurring on or after the Petition Date of any liens securing obligations in excess of $10,000 in the aggregate;

(d)      The making of any investments on or after the Petition Date except as expressly permitted by the Budget;

(e)      Debtor allows, incurs, or creates any postpetition lien or security interest, other than those (i) granted pursuant to the Order on this Motion, (ii) consented to by the DIP Lender, or (ii) junior to the prepetition liens and the lien created hereby securing obligations in an amount not to exceed $10,000 at any time outstanding;

(f)      Debtor allows, incurs, or creates any claim entitled to administrative status which is equal or senior to the Superpriority Claim granted to the Prepetition Lender herein, except as expressly provided for herein;

(g)      The entry of an order by the Court, other than the Order on this Motion, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien on or the granting of any lien on any Collateral to any federal, state, or local environmental or regulatory agency or authority, which in either case involves more than $10,000 in the aggregate;

(h)      Any portion of the Order on this Motion ceases to be in full force and effect, including without limitation, pursuant to any reversal, staying, vacatur, revocation, amendment, or modification (without the DIP Lender's consent) of the Order on this Motion;

(i)      Dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case to a chapter 7 case, or appointment of a trustee, receiver, interim receiver, or manager, or appointment of a responsible officer or examiner with enlarged powers in any of the Chapter 11

Case (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) or the sale without the DIP Lender's consent, of all or substantially all of the Debtor's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations;

(j)     The entry of a judgment or order by this Court or any other court modifying, limiting, subordinating, recharacterizing, or avoiding the validity, enforceability, perfection, or priority of any of the Debtor's obligations under the Order on this Motion, the Prepetition Obligations, the Prepetition Liens, any obligations under the prepetition loan documents, the Adequate Protection Liens, or the Superpriority Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; or the Debtor commences, joins, or assists in any such proceeding, challenge, objection, defense, claim, or counterclaim of any kind or nature against the DIP Lender or that seeks relief that is inconsistent or contrary in any respect to any of the Debtor's Stipulations or any of the Debtor's other acknowledgements and stipulations contained herein;

(k)     The failure to make any other payment to or for the benefit of the DIP Lender as set forth herein when due and such failure shall remain unremedied for two (2) business days;

(l)     The entry of an order by the Court on this Motion or any other Court avoiding, recharacterizing, subordinating, or requiring repayment of any portion of any payment made pursuant to the terms of the Order on this Motion, or terminating any Adequate Protection Liens;

(m)     The entry of any order that seeks payment in respect of a prepetition claim in excess of $10,000 in the aggregate, without the consent of the DIP Lender;

(n)     The termination or modification of the exclusive right of the Debtor to file and/or solicit acceptances of a plan of reorganization under section 1121 of the Bankruptcy Code;

(o)     The failure by the Debtor to comply with any of the provisions of the Order on this Motion (except as other expressly addressed in clauses (a)-(n) and (p)-(u) of this paragraph);

(p)     The filing of a motion by the Debtor seeking any modification or extension of the Order on this Motion without the prior written consent of the DIP Lender;

(q)     The entry of an order precluding the DIP Lender or the Prepetition Lender to have the right to or be permitted to "credit bid";

(r)     After the Petition Date, the Debtor fails within 15 days to pay, bond or otherwise discharge one or more judgments or orders for the payment of money in excess of $10,000 in the aggregate, which judgment(s), in any such case, is/are not stayed on appeal or otherwise being appropriately contested in good faith;

(s)     The failure of the Debtor to obtain entry of the Bid Procedures Order by June 9, 2015;

(t)     To the extent the Debtor is required to hold an auction pursuant to the terms of the Bid Procedures Order, failure to hold such auction by June 25, 2015; and

(u)     The failure of the Debtor to obtain entry of a Sale Order by June 29, 2015.

51.     *Approval of the Breakup Fee*.  The Court will consider approval of the Breakup Fee proposed in the Motion (and as more fully defined in the Agreement) at the Final Hearing.

52.    *Insurance*.  To the extent the Prepetition Lender is listed as loss payee under the Debtor's insurance policies, the DIP Lender is also deemed to be the loss payee under the Debtor's insurance policies and shall act in that capacity and subject to the terms of the DIP Loan Documents, distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations, and second, to the payment of the Prepetition Obligations.

53.    *Cash Management*.   The Debtor shall maintain a cash management system consistent with any order of the Court approving the maintenance of the Debtor's cash management system (the "Cash Management System") and the final order approving the Cash Management System shall be reasonably satisfactory, in form and substance, to the DIP Lender.

54.    *Sales.*  No portion of the Collateral in excess of a fair market value of $25,000 in the aggregate shall be transferred, sold, leased, or otherwise disposed of (including through merger, consolidation or otherwise) outside of the ordinary course of business without the prior consent of the DIP Lender.

55.    *Order Governs*.   Except as specifically amended, supplemented or otherwise modified by the Order on this Motion, in the event of any inconsistency between the provisions of the Order on this Motion and the DIP Loan Documents, the provisions of the Order on this Motion shall govern.  Notwithstanding the provisions of the Order on this Motion and the DIP Loan Documents, nothing herein or therein shall be deemed to amend, modify, or reduce the prepetition obligations owed by the Debtor in the full amount outstanding as of the Petition Date.

56.    *Limitation of Liability*.  Subject to entry of the Final Order, in determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to the Order on this Motion,

the DIP Loan Documents, the DIP Lender shall not be deemed solely by reason thereof to be in control of the operations of the Debtor or to be acting as a "<u>responsible person</u>" or "<u>owner or operator</u>" with respect to the operation or management of the Debtor.  Furthermore, nothing in the Order on this Motion or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtor.

57.     *Headings Merely Descriptive*.   All headings are descriptive and for reference only, and do not have separate meaning or change any terms therein.

58.     *Service of the Order on this Motion*.   The Debtor shall serve the Order on this Motion on all of the following parties: (a) the Office of the United States Trustee; (b) the DIP Lender, the Prepetition Lender, and any other secured lender appearing in this Case, and their respective counsel of record, if applicable; (c) all creditors known to the Debtor who have or may assert liens against any of the Debtor's assets; (d) the twenty (20) largest unsecured creditors of the Debtor, on a consolidated basis; and (e) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules.

59.     *Effectiveness*.   The Order on this Motion shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry thereof, and there shall be no stay of effectiveness of the Order on this Motion.

60.     *Final Hearing*.   The Debtor requests the Final Hearing be scheduled for **June 22, 2015 at 10:00 a.m.** (prevailing Central time) before this Court. The Objection Date for parties to object to terms set forth in the Motion or relief granted in the Order on this Motion shall be the end of business on **June 21, 2015**.

WHEREFORE, based upon the foregoing, the Debtor requests that this Court (a) approve this Motion; (b) grant the relief requested in this Motion, including approving the DIP Loan under the terms and conditions set forth herein, in the DIP Loan Agreements, and the Interim Financing Order; (c) enter the Interim Financing Order; and (d) grant such other and further relief as may be just and equitable under the circumstances.

Dated:  May 31, 2015

/s/      *Jeffrey Goetz*
Jeffrey D. Goetz, Esq., IS #9999366
Bradshaw Fowler Proctor & Fairgrave P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/243-4191
515/246-5808 FAX
Email:goetz.jeffrey@bradshawlaw.com

Proposed General Reorganization Counsel for
Debtor and Debtor-in- Possession,
Newton Manufacturing Company

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing:

/s/      *Barbara Warner*